[Crim. No. 23924. Apr. 28, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS MARTIN THOMPSON, Defendant and Appellant.

90

COUNSEL

Quin Denvir, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John W. Carney, Keith I. Motley and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARGUELLES, J.—This case involves the rape and murder of 20-year-old Ginger Fleischli on September 11, 1981. For these offenses, the jury convicted defendant of one count of first degree murder (Pen. Code, §§ 187, 189)[1] and one count of forcible rape (§ 261, subd. (2)) and found true allegations that defendant personally used a knife in the commission of these crimes (§ 12022, subd. (b)). In addition, the jury found true one special circumstance allegation: that the murder occurred in the commission of rape (§ 190.2, subd. (a)(17)(iii)). At the penalty phase, the jury returned a sentence of death. The matter is before us on automatic appeal. (§ 1239.)

We conclude that the judgment should be affirmed in its entirety.

---

[1] Unless otherwise indicated, all section references are to the Penal Code.

GUILT PHASE

FACTS

A. *The Prosecution Case*

The prosecution's theory was that the victim Ginger Fleischli was raped and then killed by defendant Thomas Thompson to prevent her from reporting the rape and thereby possibly interfering with an imminent and illegal foreign venture defendant had planned. Fleischli met defendant through David Leitch who, in defendant's view, had a motive to kill her himself. Fleischli had lived with David Leitch in an apartment at 1261 Ocean Front in Laguna Beach.[2] In August 1981, Fleischli moved out of the apartment and defendant moved in. By September, Fleischli had apparently moved in with David Leitch's ex-wife, Tracy Leitch, whom she had known for some six years.

About 7:30 p.m., on September 11, 1981, Fleischli and Tracy Leitch met at a pizza parlor on Balboa Island, where they encountered defendant and David Leitch. David and Tracy Leitch decided to visit David Leitch's father since David wanted to discuss working for him on the following Monday. There was some discussion about defendant and Fleischli going along, and the foursome got into Leitch's car and went to the Sandpiper Inn on Pacific Coast Highway in Laguna Beach. Defendant and Fleischli remained there drinking, however, while David and Tracy Leitch left. Tracy Leitch later testified that at the pizza parlor Fleischli had expressed fear that she would be killed if she went with defendant.

Fleischli and defendant were joined around 9:30 p.m., by Afshin Kashani. The evening included drinking and dancing both at the Sandpiper Inn and later at a nearby bar known as the Boom-Boom Room. Kashani and defendant, in addition to drinking, also smoked some hashish provided by Kashani.

About 1 a.m., defendant, Kashani, and Fleischli walked back to the Ocean Front apartment where defendant and Kashani smoked additional hashish. Around 2 a.m., Fleischli left to get some soda at a nearby liquor store; and, in her absence, defendant told Kashani he wanted to be with

---

[2] This apartment was rented in March or April 1981 by Tracy Obert. David Leitch moved in around the time of his divorce in June. Fleischli joined them about a week later. Fleischli had been sexually involved with Leitch prior to his marriage in 1978 and resumed sexual relations with him when she moved into the apartment in 1981.

Fleischli that weekend and Kashani could have her after defendant left the country.[3]

Kashani left the apartment, but on the way to his truck realized he had forgotten his cigarettes and walked back to the apartment to retrieve them. When he arrived, the door was open and defendant seemed nervous, handing Kashani's cigarettes out to him through the door rather than inviting him back into the apartment.[4]

Fleischli was not seen alive again.

Tracy Leitch testified that the next morning, September 12, she asked defendant where Fleischli was and defendant told her Fleischli had left with Kashani from the Sandpiper Inn. Again that evening, when Tracy encountered defendant at a party, she expressed concern about Fleischli's whereabouts, and defendant referred to Fleischli in the past tense saying he had liked her, she was a nice girl. The following day Tracy Leitch filed a missing person's report with the Newport Beach Police Department.

Fleischli's body was found on September 14, 1981, in a grove of trees near Interstate 5 in Irvine. Two footprints were found near the body—one made by a smooth soled shoe and the other made by a rippled or wavy soled shoe.[5] The body was wrapped in an old sleeping bag and pink blanket, both of which Obert had left at the apartment when he had moved out. Fibers from the pink blanket matched fibers found in the trunk of David Leitch's car and fibers found on the body matched the carpet in the Ocean Front apartment. A red smear on rope wrapped around the body also matched paint from the trunk of Leitch's car.

Fleischli's head was wrapped with silver duct tape, two towels, a sheet, and her jacket. Her shirt and bra had been cut in front and pulled down to her elbows. There was no evidence of vaginal tearing or bruising. Her Levis were fully zipped but not buttoned. She wore no underwear, shoes or socks, and a vaginal swab revealed the presence of semen consistent with defendant's blood type.

---

[3] As we more fully discuss hereafter, defendant had discussed with Obert his plan to smuggle Southeast Asian refugees, gold, and possibly cocaine out of Thailand. His trip out of the country was apparently imminent.

[4] Kashani testified that when he finally left, he drove to the nearest liquor store to look for Fleischli and tell her he was leaving. When he did not find her there, he departed for home.

[5] The wavy-soled shoeprint was of the same size and pattern as a pair of shoes David Leitch had been wearing that month.

White marks around two fingers suggested she had been wearing rings.[6] Her ankles, hands, wrists, and left elbow showed bruising which had occurred within fifteen minutes to three hours prior to death and appears to have resulted largely from the handling of the body. One bruise to a wrist was consistent with use of handcuffs.

Fleischli had been stabbed five times in the head near her right ear. One of the stab wounds, inflicted with a single-edged knife, extended through the ear two and one-half inches, penetrating the carotid artery and causing death.[7] Subsequent investigation uncovered bloodstains identified as the victim's blood in the carpet at the Ocean Front apartment.[8]

Defendant was arrested in Cabo San Lucas, Mexico, on September 26, 1981, and handcuffs were found in his possession. Defendant admitted to Deputy Sheriff Coder that Fleischli had come to the apartment that evening; but he claimed she went to the liquor store, Kashani left, and defendant had then fallen asleep. He claimed that to his knowledge she had not returned. Defendant also said that the next morning, Tracy Leitch asked what he had done with Fleischli, and he told her Fleischli had left with Kashani although he now claimed she had never returned. Defendant subsequently also appeared to know the victim had died of stab wounds to the head even though this information had not been released to the public. Defendant claimed David Leitch had told him this in Mexico.

Two county jail inmates, Fink and Del Frate, testified that during defendant's incarceration before trial he told them he had forced Fleischli to have sex with him and then stabbed her so she would not tell anyone. Del Frate claimed defendant, while earlier suggesting David Leitch had committed the killing, later admitted he had stabbed the victim twice in the head with a scuba knife, and David Leitch had helped him dispose of the body and clean up the apartment.[9] Del Frate testified that defendant told him he wanted to find a witness to implicate Leitch, have Del Frate make an attempt on the

---

[6]Defendant was initially charged not only with rape but with robbery and robbery special circumstances and there was testimony regarding jewelry the victim had been wearing which was never recovered. The trial court, however, granted a motion for judgment of acquittal under section 1118.1 with respect to these charges.

[7]David Leitch owned a fishing knife with a four-inch blade. The knife was at the apartment the day of the killing but subsequently disappeared.

[8]The defendant and the victim both had Type A blood; however, analysis of subgroupings allowed identification of this bloodstain as belonging to the victim. On September 12, Tracy Leitch had noticed the carpet in the Ocean Front apartment was wet, since when she knelt on the carpet she had gotten a damp stain on her slacks. Despite an apparent attempt to clean it up, however, blood remained on the back of the carpet, carpet padding, and cement slab floor beneath.

[9]An expert was called to testify that a "scuba knife" actually has a wide, thick blade and wide point inconsistent with the injuries inflicted in this case.

life of Tracy Leitch so she would cease protecting her ex-husband, or have Del Frate kill David Leitch and bury the body so authorities would think Leitch was guilty and had fled the country.

### B. *The Defense Case*

Defendant claimed that he did not commit the murder but that David Leitch probably did.[10] Defendant testified that he had moved in with Leitch preparatory to their planned trip to Thailand. Defendant claimed Leitch indicated his mother would give him a boat (something Leitch's mother denied on rebuttal ever discussing with her son); and defendant suggested that rather than smuggle cocaine out of South America as Leitch intended, they should use the boat to pick up Vietnamese refugees and, in return for their gold, give them passage out of Thailand to United States soil. He denied any plan to kill a boat owner or the refugees.

Defendant claimed that on the night of September 11, after Kashani had finally departed,[11] Fleischli returned from her errand to the liquor store. Defendant testified that Fleischli "had a suggestive look and one thing led to the other" and the couple had engaged in consensual sexual intercourse, after which Fleischli got dressed in anticipation that David Leitch was going to pick her up and drive her home. As Fleischli began to dress, defendant, feeling the effects of hashish and alcohol, passed out and remembers nothing until the next morning when he awoke with a hangover to find David and Tracy Leitch in the apartment, Tracy demanding to know what he had done with Fleischli. Defendant slept off his hangover that day, but at a party that night asked Tracy if Fleischli would be there. Tracy allegedly said Fleischli was not going to attend.

Defendant claimed that the next day, September 13, he saw David Leitch washing his car. On Tuesday, September 15, one day after Fleischli's body had been discovered, defendant claimed David Leitch came to the apartment very nervous and tense and told defendant they were going to leave that day for Cabo San Lucas to await the boat his mother was arranging for their Southeast Asian trip. They packed, put some things in storage, and drove to Mexico in Leitch's car, finally camping on the beach at Cabo San Lucas.

Defendant claimed that when no boat arrived, he asked Leitch to call his mother. After a call, Leitch told defendant Fleischli had been murdered,

---

[10] Leitch was originally a codefendant. His case was severed, however, and he was subsequently convicted of second degree murder for his involvement in Fleischli's death.

[11] Defendant maintained Kashani had returned for his hash pipe, not his cigarettes. Defendant also explained his behavior on Kashani's return by saying he had simply been startled when Kashani unexpectedly reappeared at the apartment.

stabbed with a pocket knife in the head. A day or two later Leitch left, allegedly to make another call. Instead, he pawned his car (its trunk having been freshly washed out) and bought an airline ticket back to the United States. Defendant was thereafter arrested by Mexican authorities.

Defendant presented evidence that he was, even without the influence of alcohol or hashish, a very heavy sleeper and hence could have slept through Fleischli's being bound, gagged, and stabbed to death in the same studio apartment.[12] He denied seeing blood on the floor or noticing the rug was wet. Defendant also suggested David Leitch hated Fleischli, blaming her for the breakup of his marriage and failure to reconcile with Tracy Leitch.[13] David Leitch was also portrayed as having been assaultive toward other persons.

Defendant denied making any admissions to inmates Fink and Del Frate. In addition to bringing out their criminal records, defendant presented three inmate witnesses of his own who testified that Del Frate frequently tried to get other inmates to talk about their cases, had a grudge against defendant, and was being paid by Leitch's family to testify against defendant. Fink, a heroin user, had informed against others, and defendant suggested Fink was motivated in this case by the hope he could serve his time in an institution of his choice.[14] Further, defendant claimed that during an absence from his cell, inmates had been seen in the cell reading police reports and documents relating to his case and taking notes, presumably enabling them to give convincing testimony against him.

DISCUSSION

I.

*Victim's Statements Indicating Fear of Defendant*

A. *Admission of Victim's Statement*

█ Defendant first contests the admissibility of certain statements by Fleischli to Tracy Leitch concerning Fleischli's fear that defendant might

---

[12] Defendant also gave, however, a rather colorful and self-serving account of his being awakened in Mexico by "federales" clicking back the hammers of revolvers pointed at his head. The prosecutor made the interesting point that this sound seems to have disturbed defendant's sleep, yet he claimed the rape and murder of Fleischli a few feet away did not awaken him. Defendant at that point amended his story to claim Mexican authorities had also shaken him awake.

[13] In fact, defendant testified that David Leitch had, while drunk, expressed a desire to have Fleischli killed.

[14] Apparently Fink faced only a month of remaining custody and wanted to serve it at a correctional institution in Chino rather than in Tracy.

kill her. Tracy Leitch testified that around 8 p.m. on the night of the crime, when the parties were still at the pizza parlor, Fleischli asked Tracy whether, if she went with Tom (the defendant), "Do you think Tom would kill me?"

The prosecution sought to introduce this statement pursuant to Evidence Code section 1250 as evidence of declarant's state of mind on the evening she was killed. There was evidence the victim had had sexual intercourse near the time of her death, and the prosecution's theory was that it was rape, not consensual intercourse. Defendant was charged not only with murder but with rape and the special circumstance of murder during the commission of rape. The victim's fear of defendant would tend to prove that she did not have intercourse willingly.

The defense objected that even with a limiting instruction the jury would not consider this evidence only to determine the victim's lack of consent to sexual intercourse; they would use it to determine whether defendant killed her. Further, counsel argued the circumstances of the statement cast doubt on its reliability. It was just something said when the parties were "sitting around," "having a bunch of cocktails." There had been no evidence of animosity between defendant and Fleischli prior to this alleged statement being made.

The court accepted the prosecution's argument that this evidence would be important in showing intercourse was not consensual, and it expressed the belief a jury could follow a limiting instruction on this matter. It therefore ruled: ". . . the court has weighed and considered the legitimate interest of the People to prove lack of consent and will allow the information about the statement or state of mind of the victim to be elicited from this witness. . . ."

Prior to the testimony coming in, the court, in compliance with Evidence Code section 355, gave the jury a limiting instruction which said: "Ladies and gentlemen, you are not to consider the following testimony as proof of the truth that the murder occurred or that defendant committed such killing. [¶] You may consider it only for a determination of the state of mind of the victim, Ginger Fleischli, as it regards a rape and as it may negate a consensual sex act. Okay? [¶] I'll read the last part one more time. [¶] You may consider it only for a determination of the state of mind of the victim, Ginger Fleischli, as it regards a rape and as it may negate a consensual sex act. [¶] That's the only purpose for this, and it's the only use you can put it to in your deliberations."

1. *Admissibility*

Evidence Code section 1250, subdivision (a) provides that evidence of a statement of a declarant's then-existing state of mind or emotion is not inadmissible under the hearsay rule when "(1) [t]he evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or (2) [t]he evidence is offered to prove or explain acts or conduct of the declarant."

Where that evidence involves the victim's fear of the defendant, we have initially looked to whether the victim's state of mind was really in dispute and whether it was relevant to an issue in the case. (*People* v. *Armendariz* (1984) 37 Cal.3d 573, 584-587 [209 Cal.Rptr. 664, 693 P.2d 243]; *People* v. *Arcega* (1982) 32 Cal.3d 504, 526-527 [186 Cal.Rptr. 94, 651 P.2d 338]; *People* v. *Green* (1980) 27 Cal.3d 1, 23 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Ireland* (1969) 70 Cal.2d 522, 529-532 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Lew* (1968) 68 Cal.2d 774, 779 [69 Cal.Rptr. 102, 441 P.2d 942].) Here Fleischli's conduct on the evening of the killing, and specifically whether she willingly had intercourse with defendant, was very much in issue given the prosecution theory of murder during commission of rape.[15] As her expression of fear of defendant on the very night of the murder tends to indicate she did not consent to intercourse, it was relevant in this case. (See *Arcega, supra,* 32 Cal.3d at p. 527; *Lew, supra,* 68 Cal.2d at p. 779.)

Even if such evidence is relevant, we have stressed its potential prejudice and have required that the trial court engage in a careful weighing of its probative value against the danger of undue prejudicial effect on the jury. (*People* v. *Coleman* (1985) 38 Cal.3d 69, 92-93 [211 Cal.Rptr. 102, 695 P.2d 189]; *Armendariz, supra,* 37 Cal.3d at pp. 588-589; *Green, supra,* 27 Cal.3d at p. 26.) Here the statement did not occur long before the rape and killing. It was not cumulative to other evidence. And as originally introduced, it seemed significant to the prosecution case. The autopsy did not provide direct evidence of forcible sexual intercourse although it also did not negate it. The suggestion that Fleischli feared defendant and on returning from the liquor store to find him alone in the apartment would not have engaged in a

---

[15] It is on this point that we may distinguish the numerous out-of-state cases cited to us by defendant. (See *People* v. *Huber* (1985) 131 Ill.App.3d 163 [86 Ill.Dec. 385, 475 N.E.2d 599, 601]; *People* v. *Floyd* (1984) 103 Ill.2d 541 [83 Ill.Dec. 335, 470 N.E.2d 293, 295-296]; *Commonwealth* v. *Bond* (1984) 17 Mass.App.396 [458 N.E.2d 1198, 1200]; *People* v. *Madson* (Colo. 1981) 638 P.2d 18, 29; *Kennedy* v. *State* (Fla.App. 1980) 385 So.2d 1020, 1021-1022; *People* v. *White* (1977) 401 Mich. 482 [257 N.W.2d 912, 922-923]; *State* v. *Wauneka* (Utah 1977) 560 P.2d 1377, 1380; *Commonwealth* v. *DelValle* (1966) 351 Mass. 489 [221 N.E.2d 922, 924].) The declarant/victim's state of mind and conduct consistent therewith was not at issue in these cases.

sexual encounter with him contributed to the inference of force to be gained from bruises on, and the condition of, the victim's body.

As for prejudicial effect, this rather isolated statement stands in contrast to the situation in *Coleman* where poignant letters described the victim's feelings of despair and the tragic development of the family's problems. (*Coleman, supra,* 38 Cal.3d at p. 81-82.) The victim in *Coleman* described at length the conduct of the defendant in trying to hurt her and threatening to kill her family. (*Id.* at p. 82.) Here no conduct was ascribed to defendant. The statement related to Fleischli's attitude alone. (Compare also, *People* v. *Ruiz* (1987) 44 Cal.3d 589, 607-609 [244 Cal.Rptr. 200, 749 P.2d 854] [involving several statements of fear made by the victim well before the fatal incident].)

■ Defendant points out that the weighing process which trial courts are required to engage in under Evidence Code section 352 must appear on the record. (*Green, supra,* 27 Cal.3d at p. 25.) He complains that the weighing process was not made explicit in this case. We must disagree. There is no particular formula a trial court must follow in indicating that probative value has been weighed against prejudice. The goal is that the trial court engage in such process and that the record affirmatively demonstrate, for purposes of later appellate review, that it has done so. (*Ibid.*) The record amply reflects such careful consideration in this case.

■ Defendant further notes that under Evidence Code section 1252, a statement of mental or physical condition remains inadmissible if the statement was made "under circumstances such as to indicate its lack of trustworthiness." (See also *Coleman, supra,* 38 Cal.3d at p. 84; *Lew, supra,* 68 Cal.2d at p. 780; *People* v. *Hamilton* (1961) 55 Cal.2d 881, 893 [13 Cal.Rptr. 649, 362 P.2d 473] [disapproved on other grounds in *People* v. *Wilson* (1969) 1 Cal.3d 431, 442 [82 Cal.Rptr. 494, 462 P.2d 22].) But the victim's statements here did not purport to narrate past conduct and there is no obvious reason for her to manufacture an expression of fear she did not feel. (See generally *People* v. *Howard* (1987) 44 Cal.3d 375, 404-405 [243 Cal.Rptr. 842, 749 P.2d 279].) If we accept that she made the statement, and Tracy Leitch was subject to cross-examination in that regard, it was not made under circumstances suggesting a motive to fabricate. In short, given that defense counsel explicitly argued lack of trustworthiness to the court prior to the court's ruling, the trial court would appear to have considered and rejected this argument in the course of considering the probative value of this evidence.

2. *Effect of Limiting Instructions*

Finally, defendant contends that limiting instructions, such as those noted above, are ineffective. He finds support in our decision in *People* v.

*Coleman, supra,* which while not involving the exception in Evidence Code section 1250, does contain colorful language concerning the enormous impact of accusations from the grave whose "reverberating clang" drown out "all weaker sounds." (*Coleman, supra,* 38 Cal.3d at pp. 82-83, 93.)

We have no quarrel with *Coleman's* conclusion that "[a]ccusatory statements 'from the grave' such as these have so great a potential to unfairly prejudice the defendant that the courts have long recognized that a limiting instruction will be insufficient to prevent improper use." (*Id.* at p. 93 citing, inter alia, *Shepard* v. *United States* (1933) 290 U.S. 96 [78 L.Ed. 196, 54 S.Ct. 22].) But the statements *Coleman* referred to involved inflammatory letters written by one of the victims, defendant's wife, months before the crime. They poignantly described her feelings of hopelessness and despair and asserted that defendant had twice tried to hurt her and many times had threatened to kill the family. (*Coleman, supra,* 38 Cal.3d at pp. 81-82.) Here the victim only hours before her death made one statement indicating her personal fear of the defendant, a statement directly relevant to her subsequent conduct and recounting no past conduct of the defendant. *Coleman's* conclusion as to the inadequacy of limiting instructions just does not apply in this context.

The limiting instructions as set forth above repeatedly directed the jury to consider Fleischli's statement only insofar as it was relevant to the subsequent alleged rape. There is no reason to believe the jury was incapable of following those instructions. We therefore conclude that the trial court did not err in admitting her statement into evidence.[16]

## B. *Subsequent Instructions*

Defendant contends that subsequent instructions to the jury at the conclusion of the guilt phase of this trial contradicted the limiting instruction and permitted the jury to consider Fleischli's statement for the improper purpose of determining whether defendant had killed her rather than for the limited purpose of her state of mind and likely conduct on the night of the crime. He points first to the fact the trial court gave the standard instruction on prior inconsistent statements (CALJIC No. 2.13) which informed the jury that prior consistent or inconsistent statements could be

---

[16] We likewise reject defendant's argument that it was error for the trial court not to renew limiting instructions when defense counsel addressed this statement on cross-examination of Tracy Leitch some days later. On cross-examination, Leitch admitted that the statement she had earlier given the court was not accurate. She testified Fleischli had in fact said "Do you think *David would have* Tom kill me." The jury's attention was certainly not being called to the possible truth of the matter stated in the first version of Fleischli's statement. It was being called to this witness's admission that she had earlier lied to the court.

considered "not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on such former occasion."

It does not appear that this general instruction could have been understood by the jury as directly inconsistent with the prior limiting instructions telling the jury that Fleischli's statements of fear should be considered only as to her state of mind. Furthermore, it is not reasonable to believe that a jury would apply this instruction to accept the truth of the statement as initially testified to by Tracy Leitch when she admitted she had altered it in an attempt to protect her former husband. (See fn. 16, *ante*.) Finally, the instruction on prior inconsistent statements was immediately followed by instructions directing the jury, in judging the credibility of witnesses, to consider bias, interest, or other motive, inconsistencies in testimony, and admissions of untruthfulness; and the jury was advised that a witness willfully false in one material part of his testimony was to be distrusted in others. (CALJIC Nos. 2.20, 2.21.) Obviously these more directly relevant instructions would have had more impact on the jury's consideration of Tracy Leitch's testimony than did the prior inconsistent statement instruction.

■ A more significant problem, however, is presented by an instruction requested by the People and given by the court which advised the jury that: "In deciding whether the defendant's guilt has been established beyond a reasonable doubt as to the murder charge, you may consider the following evidentiary factors: . . . [¶] Seven, that prior to the victim's demise she had expressed a fear of physical harm from the defendant." This *did* directly contradict the limiting instruction given when the evidence was admitted,[17] and it improperly advised the jury that it could consider the victim's expression of fear as evidence defendant had committed the murder.

It would appear that including this factor in the list of evidentiary matters to be considered with respect to the murder charge was an error the parties simply overlooked. Both sides submitted special instructions containing separate lists of such factors for the murder and for the rape. The victim's statement of fear should, consistent with the limiting instruction, have been included in the instruction governing factors relevant to the rape only.

---

[17] It also conflicted with the instruction which stated: "Certain evidence was admitted for a limited purpose. [¶] At the time this evidence was admitted you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. [¶] You are again instructed that you must not consider such evidence for any purpose except a limited purpose for which it was admitted."

However, given the other listed factors—including defendant's access to handcuffs and knife, being alone in the apartment, and inconsistencies in defendant's accounts of the crime—it is not likely the jury would have focused on this factor. Certainly in his final argument the district attorney did not argue this factor, accepting instead the possibility that Fleischli did ask whether David Leitch would have defendant kill her, and focusing on the importance of Tracy Leitch in establishing defendant's lie, made also to the police, that Fleischli had left with Kashani on the night of the crime.

Finally, in many ways the defense gained as much from the prosecutor's opening up of this area as it lost. Because Fleischli's alleged fear of defendant had been introduced, the defense presented evidence that prior to the crime Fleischli had called police to help her remove her personal property from the apartment since she feared David Leitch and claimed he had threatened to kill her. They also introduced evidence that three years earlier, David Leitch had assaulted some traveling companions, sending one to the hospital with a concussion. Fleischli knew of this incident, and the defense suggested and argued in its closing argument that if Fleischli feared anyone, she feared David Leitch. (See generally *People* v. *Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99] [right of defendant to introduce evidence of third-party culpability].)

Furthermore, the court gave proposed defense instructions which listed, as evidentiary factors going to whether there was a reasonable doubt defendant committed the murder, "Seven, that on no occasion prior to the victim's demise had the defendant expressed any animosity, ill will or intent to harm the victim. [¶] Eight, that prior to the victim's demise she had expressed a fear of physical harm from David Leitch. [¶] Nine, that prior to the victim's demise David Leitch had expressed hate and ill will toward the victim and had threatened to have her killed." In sum, the effect upon the guilt phase of this trial of improperly listing Fleischli's statement of fear of the defendant in requested instructions relating to murder, rather than in requested instructions on factors relating to the rape, was harmless under any standard of prejudice.

## II.

### Defendant's Planned Southeast Asian Trip

#### A. Introduction, Limitation, and Readmission of Evidence

In his second issue defendant urges that the trial court erred in admitting certain evidence concerning defendant's planned Southeast Asian trip. The

prosecutor offered to show that defendant had discussed with Tracy Obert his plan to go to Southeast Asia. As defendant had no apparent financing for this venture, the trip provided motive for the robbery with which defendant was at the time still charged. Further, since the trip might involve loss of life and since it was very important to defendant, the trip might also suggest a motive for killing the victim after the alleged rape. If the rape were disclosed, defendant might be prevented from leaving the country. Over specific defense objections that the prejudicial effect of this evidence far outweighed its probative value, the trial judge ruled it admissible.

Tracy Obert subsequently testified that defendant planned an expedition to Southeast Asia to smuggle refugees, gold, and possibly cocaine. He went on to say that defendant planned to get a boat for this venture by killing the owner's son and further, while initially planning to smuggle refugees out of Thailand, defendant later decided it would be easier to kill them after obtaining their gold.

Defendant again objected that this evidence was inflammatory and not probative, and that it conveyed to the jury the impression that if defendant was willing to be involved in these other killings, he was more likely to have committed this homicide. He moved for mistrial. While the prosecutor initially argued that the violence of the mission and its importance to defendant were relevant to motive, he later claimed he did not know that these details, regarding killing the boatowner's son and the refugees, would come out; and he agreed with the trial court's striking this reference to killing refugees and the boatowner's son and admonishing the jury to disregard it. The trial court did strike that portion of the testimony, ordered the jury to disregard it, and commented: "People will often state plans with absolutely no intention of carrying them out."

Over the objections of his attorney, defendant testified in his own defense; and on direct examination he again took up the issue of the Southeast Asian trip. He claimed he met David Leitch while searching for someone who might have access to a boat and would be interested in a business venture involving transportation of refugees from Thailand to a United States colony. This was a purely legitimate, even altruistic business venture. It was Leitch who said his mother would provide a boat and who wanted to smuggle cocaine.

On cross-examination, the prosecutor therefore again probed whether defendant planned to kill someone to get the boat and to kill refugees. To defense objections, the prosecutor asserted the evidence was now relevant to impeach defendant's contentions about his plans which still formed an important part of the motive for the crime. The prosecutor also offered to

show that defendant had in fact threatened to kill anyone who got in the way of his plan.

The trial court overruled defense objections, finding the proposed evidence relevant to impeachment, although the prosecutor continued to argue that motive was a ground for its admission. Defendant then denied he had intended to kill to get the boat or that he intended to kill refugees. He admitted the plan was very important to him and that he had said he was willing to die to carry it out, but he denied being willing to kill anyone who got in his way. Tracy Obert testified in rebuttal, repeating the contention that defendant would kill to get the boat, would kill refugees, and would kill anyone who got in his way. Obert indeed claimed he moved out of the apartment to distance himself from defendant and his scheme.

## B. *Admissibility*

■ Evidence that involves crimes other than those for which a defendant is being tried is admitted only with caution, as there is the serious danger that the jury will conclude that defendant has a criminal disposition and thus probably committed the presently charged offense. (Evid. Code, § 1101; *People* v. *Thompson* (1980) 27 Cal.3d 303, 314, 316-317 [165 Cal.Rptr. 289, 611 P.2d 883].) We have held that to be admitted, evidence of other crimes must be relevant to some material fact at issue, must have a tendency to prove that fact, and must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. (*People* v. *Bigelow* (1984) 37 Cal.3d 731, 747 [209 Cal.Rptr. 328, 691 P.2d 994]; *Thompson, supra,* at pp. 315-318.)

While in the present case it was not asserted that defendant actually committed other crimes, actually killed to obtain his boat or to obtain gold from refugees, the danger in admitting evidence that he planned such offenses was similar. He would be portrayed as a dangerous person more likely than others to have committed the present offense. (See *People* v. *Cardenas* (1982) 31 Cal.3d 897, 904-907 [184 Cal.Rptr. 165, 647 P.2d 569] [affiliation with violent youth gangs, narcotics addiction].)

### 1. *Motive*

■ We turn first to admission of evidence that defendant had indicated he would kill anyone who got in the way of his plan, and we conclude that this evidence was admissible as to whether or not defendant had a motive to kill Fleischli. Motive was an important issue in this case since defendant maintained he and Fleischli had been on excellent terms. If the two had consensual sex, he argued, why would he harm her? (Compare *People* v.

*Hamilton* (1985) 41 Cal.3d 408, 426 [221 Cal.Rptr. 902, 710 P.2d 981] [relevance of other crimes to motive too speculative]; *Bigelow, supra,* 37 Cal.3d at p. 748.) David Leitch, he maintained, was the one with the motive to kill Fleischli particularly if he returned to the apartment to find her getting dressed and defendant asleep after a sexual encounter. Establishing that defendant had threatened to kill anyone who got in the way of his Southeast Asian scheme was an important step toward providing the missing motive. It was thus admissible to show defendant's state of mind where other evidence (for example, the testimony of Fink and Del Frate) brought this victim within the scope of defendant's general threat. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 757 [230 Cal.Rptr. 667, 726 P.2d 113].)

## 2. *Impeachment*

We have greater difficulty with evidence that he expressed willingness to kill to get the boat and to kill refugees. This had no direct probative value in establishing a motive to kill Fleischli and instead tended to suggest simply that defendant was a violent man. The trial court properly ordered this testimony stricken and admonished the jury to disregard it, unfortunately having to reiterate the testimony in the process of giving the admonition since it had been some three days since the evidence had come in.

■ It was the defendant himself who supplied the grounds for readmission of this evidence when he testified to the legitimacy of his plan. His description of the business venture portrayed something a person might well postpone, not something one would kill to pursue. His prior statements as to killing the boatowner's son and the refugees became relevant for impeachment purposes to show that this was not a normal venture but an illegal and desperate scheme.

We reject the suggestion that cross-examination as to defendant's prior statements about this venture was improper impeachment on a collateral matter. The prosecutor did not elicit something on cross-examination just so it could be impeached with otherwise inadmissible evidence. (*People v. Armendariz, supra,* 37 Cal.3d at p. 588, fn. 16; *People v. Lavergne* (1971) 4 Cal.3d 735, 743 [94 Cal.Rptr. 405, 484 P.2d 77].) Defendant reentered this evidentiary area on his own. Nor was the nature of defendant's scheme wholly collateral to the issues in this case. (Compare *People v. Armendariz, supra,* 37 Cal.3d at p. 585.)

## 3. *Cumulative Character*

We also reject the argument that this evidence of defendant's lack of credibility was cumulative, a factor that if true would suggest impeachment

should not have been allowed. (*People* v. *Burgener* (1986) 41 Cal.3d 505, 525-526 [224 Cal.Rptr. 112, 714 P.2d 1251].) While defendant indicated the trip was important to him, his portrayal of the nature of the venture supported a very different set of inferences as to motives vis-à-vis anyone who might want to interfere with that plan. It was not an abuse of discretion for the trial court to permit the impeachment defendant's testimony invited.[18]

### 4. *Effect of Other Instructions*

Finally, defendant contends that certain instructions at the conclusion of the guilt phase negated any beneficial effect of instructions limiting the jury's consideration of this evidence. Specifically he points to the standard instruction in CALJIC No. 2.13 on prior inconsistent statements, which allows such statements to be considered as evidence of the truth of the facts stated by the witness on the former occasion, and to a portion of a special instruction requested by the People which permitted the jury, considering whether murder had been established beyond a reasonable doubt, to consider: "One, the importance to the defendant of his plan to go to Thailand and the measures he was willing to take to set this plan into operation."

We conclude that the instructions, read as a whole, did not permit improper consideration of this evidence. As noted, the fact that defendant threatened to kill anyone who got in the way of his trip was admissible on the issue of motive. As for threatening to kill refugees or to get a boat, the jury was instructed to consider this testimony only for impeachment and was told "You may not use that testimony to determine directly whether or not the defendant is guilty of the present murder or to determine that it is more likely than not that he committed the charged homicide." There is no obvious reason for the jury to understand CALJIC No. 2.13 as superseding this explicit instruction. And following this limiting instruction, they would consider defendant's measures in setting his plan into operation as referencing the threat to people who got in his way, a matter relevant to motive on which they were also instructed.

To the extent that evidence of some of these threats was introduced, the cause was as much with the defendant as with the prosecutor; and assuming any error, it is not reasonably probable that a different result would have occurred in its absence.

---

[18] We also again reject defendant's contention that the record fails to reflect the trial court's weighing of prejudice versus the probative value of this evidence. (See *Green, supra,* 27 Cal.3d at p. 25.) The record amply reflects the weighing process.

III.

*Prosecutorial Misconduct*

In his third issue, defendant contends the prosecutor committed misconduct in two remarks made during opening argument to the jury at the end of the guilt phase. In these remarks, the prosecutor said: "Mr. Brower [defense counsel] will probably not spend a lot of time asking you to believe the defendant's version, that he slept through Miss Fleischli's murder." A little later, the prosecutor, commenting on various inconsistent statements by defendant to the police and others, said: "We have all these lies. And why are these lies so important? Why won't you even hear his testimony commented on by his attorney?" Defendant contends the clear suggestion these statements conveyed to the jury was that defense counsel disbelieved his own client. Further, the statements implied defense counsel did not want defendant to testify and hence constituted a comment on defendant's exercise of his right to testify. We find no error warranting reversal.

■ A prosecutor may vigorously argue his case, marshalling the facts and arguing inferences to be drawn therefrom. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144].) We have held he may not express a personal belief in defendant's guilt, in part because of the danger that jurors may assume there is other evidence at his command on which he bases this conclusion. (*People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564].) ■ We have also held it improper for the prosecutor to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case. It is not necessary to find that such implication impinges upon defendant's constitutional right to counsel. (Compare *People* v. *Turner* (1983) 145 Cal.App.3d 658, 674 [193 Cal.Rptr. 614].) Instead it is sufficient to note that defendant's conviction should rest on the evidence, not on derelictions of his counsel. (*People* v. *Perry* (1972) 7 Cal.3d 756, 790 [103 Cal.Rptr. 161, 499 P.2d 129]; *Bain, supra,* 5 Cal.3d at p. 847.) Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom.

For the same reason, it is therefore improper for the prosecutor to argue to the jury that defense counsel does not believe in his client's defense. (See *People* v. *Purvis* (1963) 60 Cal.2d 323, 343 [33 Cal.Rptr. 104, 384 P.2d 424] [disapproved on other grounds in *People* v. *Morse* (1963) 60 Cal.2d 631, 649] [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *People* v. *Enriquez* (1961) 190 Cal.App.2d 481, 487 [11 Cal.Rptr. 889]; and see generally Annot. (1979) 89 A.L.R.3d 263, and later cases (1987 pocket supp.).) Such

argument directs the jury's attention to an irrelevant factor and might in some contexts be quite prejudicial.[19] Given the right of both counsel to engage in vigorous argument, however, we do not not find the prosecutor's comments constituted reversible error.

■ The prosecutor argued that defense counsel would not spend a lot of time asking the jury to believe defendant's version of events, because defendant's version was that he slept through the whole thing. The prosecutor's focus was thus on the evidence and his contention that the defense case was simply unbelievable. Similarly, the prosecutor commented that defendant's inconsistent stories contained lies which defense counsel would not try to justify. Again, the emphasis was on the evidence in the case, particularly evidence of defendant's varying stories both before trial and when he testified in his own defense. The prosecutor predicted that, to draw the jury's attention away from those inconsistencies, the defense would have to attack the credibility of the prosecution's informant witnesses. This did not, when read in context, depart from comment on the state of the evidence or legitimate argument on how the case should be viewed.[20]

We also cannot agree that the prosecutor's statements constituted improper comment on defendant's fundamental right to testify even against his counsel's wishes. (See *People* v. *Robles* (1970) 2 Cal.3d 205, 214 [85 Cal.Rptr. 166, 466 P.2d 710].) Defendant compares the prosecutor's remarks to comment on a defendant's failure to testify. (See generally *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].)

---

[19]Defendant cites numerous out-of-state cases finding it improper for the prosecutor to argue defense counsel did not believe his own client. To the extent these cases articulate the basis for finding such comment improper, they focus on the fact that the argument is irrelevant. Such argument does not help the jury determine whether, under the evidence presented, defendant committed the charged crime. (See *State* v. *Reilly* (Me. 1982) 446 A.2d 1125, 1129; *People* v. *Kane* (1977) 57 App.Div.2d 575 [393 N.Y.S.2d 439]; *People* v. *Monroe* (1977) 66 Ill.2d 317 [5 Ill.Dec. 824, 362 N.E.2d 295]; *People* v. *Tatum* (1976) 54 App.Div.2d 950 [388 N.Y.S.2d 329]; *People* v. *Fluker* (1976) 51 App.Div.2d 1045 [381 N.Y.S.2d 330]; *People* v. *Coles* (1975) 47 App.Div.2d 905 [366 N.Y.S.2d 216]; *Estep* v. *State* (1973) 129 Ga.App.909 [201 S.E.2d 809]; *People* v. *Tassielo* (1950) 300 N.Y. 425 [91 N.E.2d 872].) Defendant's citation to *Lowery* v. *Cardwell* (9th Cir. 1978) 575 F.2d 727 is also unavailing. In that case defense counsel clearly conveyed to the trier of fact that he felt his client was committing perjury. That situation is clearly to be distinguished from our case where the prosecutor argued that the *evidence* showed defendant was not telling the truth.

[20]That is not to say that the prosecutor did not venture onto dangerous ground in phrasing his remarks as he did. Defense counsel may face serious ethical problems in the course of conducting a particular defense. (See *Nix* v. *Whiteside* (1986) 475 U.S. 157, 166-174 [89 L.Ed.2d 123, 134-139, 106 S.Ct. 988].) The choice of arguments to be made to the jury may therefore, in some cases, reflect such difficulties. Defense counsel should not be penalized when, based on facts unknown to the prosecutor or the court and which he cannot disclose, he undertakes to handle argument in a particular manner.

Again, the record does not bear the weight of this argument. Further, if defendant perceived such an inference, it was incumbent upon him to object. (*People* v. *Green, supra,* 27 Cal.3d 1, 34.) Defendant has argued that a timely objection and admonition would not have cured the harm from the alleged prosecutorial misconduct. He claims the suggestion that defense counsel did not believe defendant's testimony was a "devastating thought" that once conveyed to the jury, could not be undone. Defendant grossly exaggerates the impact, if any, of the prosecutor's remark, and our cases do not suggest that this sort of error may not be so cured. (See e.g., *Green, supra,* at p. 35; *Purvis, supra,* 60 Cal.2d 323; *People* v. *Cheary* (1957) 48 Cal.2d 301, 318-319 [309 P.2d 431].) We therefore conclude that on this record, error did not occur.[21]

## IV.

### *Admission of Photographs of Victim*

Defendant contends that the trial court abused its discretion in admitting into evidence certain photographs of the victim. These photographs fall into three categories. First is exhibit 69, a photograph of the victim during her lifetime. It portrays an attractive young woman in a party dress and wearing a flower in her hair. The second set of photographs includes exhibits 24, 70, and 71 which are closeup shots of the victim's ear, one preautopsy and one during autopsy. Defendant did not object to number 71 which shows the ear turned back revealing the number of stab wounds to the head and giving some suggestion of their depth. He did object that number 24 showed blood on the ear and he argued number 70 was cumulative to other evidence describing the fatal wound. Third, defendant objected to exhibits 19 through 23 which depict the body in stages of being unwrapped from the blankets, towels, and duct tape in which it was found. Defendant particularly objected to number 21 in which half of the victim's face is uncovered and one eye is open. Trial counsel termed this picture the "face of death."

### A. *Photos of the Victim While Alive*

■ It is well settled that the admission of photographs of the victim lies within the discretion of the trial court and that exercise of discretion

---

[21] We further note that defense counsel himself commented on the matter. In the penalty phase, defense counsel, in explaining the impact of defendant's upbringing on his emotional development, argued to the jury: "This impression that you got of him sitting up there on the stand, my God, he's rigid. And I struggled, and *I just knew that that was going to be disastrous* because you can't get next to him, you can't talk to him, you can't get any feeling for him when he sits up on the stand and he doesn't have these tools to emote. He doesn't have the background, the environment that it took to let him come out to you." (Italics added.)

will not be disturbed unless the probative value of such photographs is clearly outweighed by their prejudicial effect. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 54 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Cruz* (1980) 26 Cal.3d 233, 253 [162 Cal.Rptr. 1, 605 P.2d 830]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587].) After a review of the photographs in question, we conclude there was no abuse of discretion in this case.

■ First, as to the photograph of Fleischli alive, defense counsel, while contending there was no genuine issue as to the fact that she was a live human being on the night of the crime, apparently did not expressly offer to stipulate to this point. (Compare *People* v. *Kimble* (1988) 44 Cal.3d 480, 499 [244 Cal.Rptr. 148, 749 P.2d 803]; *People* v. *Ramos* (1982) 30 Cal.3d 553, 577 [180 Cal.Rptr. 266, 639 P.2d 908], revd. on other grounds *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].) Furthermore, even if counsel's comments were sufficient to indicate that the victim's status as a human being was not an issue (see *People* v. *Hendricks* (1987) 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350]), it cannot be said the photograph was irrelevant in this case. Defense counsel himself used it in questioning a police officer whom Fleischli had called to the apartment to protect her from David Leitch; and the officer identified Fleischli as the complaining party based on this photograph.

Finally, this was not a photograph particularly calculated to elicit sympathy. As the prosecutor noted, the result might be different if the photograph portrayed Fleischli "with little children or showed her at church or showed her in some type of manner [*sic*] that would be an attempt to arouse the sympathy of the jury. . . ." This was, however, simply a picture of the victim alive. We conclude that the photograph did not unduly prejudice the defendant in any way.

B. *Photos of the Stab Wounds to the Head*

■ As for the photographs of the victim's head and particularly the ear through which the fatal stab wound had been inflicted, these exhibits were used by the pathologist to describe and explain the wounds to the head and which of them had resulted in death. They were thus clearly relevant in indicating the manner in which the crime had been committed. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1256 [232 Cal.Rptr. 849, 729 P.2d 115]; *Frierson, supra,* 25 Cal.3d at p. 171.)

Defendant's suggestion that they were cumulative to other evidence and need not have been used is not convincing. Even somewhat cumulative photographic evidence may be admitted if relevant. The fact that there is

other evidence on the point goes to the probative value of the photographs. In this case they were at least useful. They were not unduly bloody or gruesome, nor did they show unnecessary decay. Pictures involving that sort of problem were expressly not used by the prosecutor. Nor are we convinced that exhibits 70 and 24 were cumulative to exhibit 71. Exhibit 71 does not adequately show the fatal wound. The trial court did not abuse its discretion in finding that exhibit 71 was inadequate to show the manner of killing in this case.

## C. *Photos of the Victim's Face*

██ Defendant contends that the exhibits depicting the body being unwrapped and particularly the "face of death" photograph should have been eliminated. We have on occasion recited the fact that a victim's face was portrayed in a photograph. (See e.g., *Allen, supra,* 42 Cal.3d at p. 1255; *Frierson, supra,* 25 Cal.3d at p. 171.) This has not been focused on as determinative, nor can it be. Given the circumstances of a given killing, the portrayal of a mangled arm, a mutilated stomach, a burned foot, a slashed breast, may be more gruesome than the picture of the face of the deceased.

Exhibit 21, and the other exhibits in this series, were used in questioning the deputy sheriff who helped recover the body. It described the peculiar condition in which the body was found—the head wrapped in towels and duct tape, and the body wrapped in a blanket and sleeping bag. This condition tended to refute defendant's contention that he was drunk the night of the crime, as it suggested care was taken to minimize blood in the apartment and the car in which the body was transported. The naked upper torso, the bruises depicted in these photographs, and the manner in which clothing was pulled around the arms were supportive of the prosecution's theory that a rape had occurred. And in this series, exhibit 21 best depicts the manner in which the head was wrapped with duct tape.

Again some care was apparently taken to eliminate even more gruesome photographs from the collection ultimately used. Further when the prosecutor used photographs in the course of his closing remarks to the jury at the guilt phase, he did not use exhibit 21, 24 or 70 to which defendant particularly objected. We conclude that there was no abuse of discretion in permitting these photographs to be admitted into evidence.[22]

---

[22] In arguing against sympathy for the defendant at the penalty phase, the prosecutor noted the defense would say (as indeed it did) that the jury should not vote the death penalty unless it could face defendant's death. He then said: "Well, all of you have already seen the face of death. You've seen the face of death in Ginger Fleischli, and it's not a pretty picture and it's shocking and it's a terrible thing for all of us. But let's not forget one thing—that's a face of death he painted for no reason whatsoever." There is no indication that exhibit 21 was used

## V.

*Failure to Instruct on Intent to Kill as an Element of Felony-murder Special Circumstance*

The jury in this case was instructed: "If defendant Thomas Martin Thompson was not the actual killer, it must be proved beyond a reasonable doubt that he *intentionally aided,* abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in *the commission of the murder* in the first degree before you are permitted to find the alleged special circumstance of that first degree murder to be true as to defendant Thomas Martin Thompson." (Italics added.) The court rejected an instruction proposed by the defense which would have specifically required the jury to find *intent to kill.* Under our decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], failure to give such an instruction would have been error as it permitted the jury to find the special circumstance true without necessarily finding that defendant had the intent to kill. *(Id.* at pp. 153-154.)

■ We have recently concluded, however, that intent to kill is not an element of felony-murder special circumstances as to the actual killer. Only where defendant is an aider and abettor rather than the actual killer must intent to kill be proved. *(People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306]; see also *Tison* v. *Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 143-144, 107 S.Ct. 1676, 1688].) Under the prosecution's theory, defendant was the perpetrator. According to the defense, defendant slept through the killing which was accomplished by David Leitch. Aiding and abetting was not a theory pursued by the parties or instructed upon by the court in this case.[23] There was therefore no error in failing to instruct on intent to kill as an element of felony-murder special circumstances.

in the course of this argument, but the reference is reasonably clear. We must condemn blatant appeals to the passions of the jury. Nevertheless, we perceive no reasonable possibility that exploitation of one of the more unpleasant exhibits contributed to the ultimate verdict in this case.

[23] Even if *Carlos* were still the law, such error was cured. Since this case was tried both as a wilful, deliberate, and premeditated murder and a felony murder, the jury was fully instructed on intent to kill and the possible effect of defendant's alleged voluntary intoxication on this intent. Further, the prosecution requested and the trial court submitted to the jury a special finding which asked the jury to determine whether "the homicide of Ginger Lorraine Fleischli was an intentional killing personally committed by the defendant Thomas Martin Thompson." The jury returned this special finding. We held in *People* v. *Burgener, supra,* 41 Cal.3d 505 that such a finding can cure *Carlos* error. *(Id.* at pp. 536-540.) Defendant's attempt to distinguish the finding in this case from that in *Burgener* is not persuasive.

## VI.

*Failure to Instruct Sua Sponte That the Testimony of a Jailhouse Informant Must Be Viewed With Distrust*

 Defendant next contends that the trial court erred in failing, with respect to the testimony of witnesses Fink and Del Frate, to instruct the jury that such testimony must be viewed with distrust. Both witnesses had been incarcerated in county jail with defendant and, as noted, had testified to certain admissions defendant made to them concerning this crime. These admissions were quite damaging.

Fink testified that defendant admitted going out with a girl to a bar, returning to David Leitch's apartment, and forcing her to have sex when she resisted. Fearing she would go to the police, defendant killed her, taking care of the matter "in a quiet way like if he was in the jungle"; and when Leitch returned to the apartment, defendant convinced Leitch to help him dispose of the body.

Del Frate testified defendant admitted he, Kashani and Fleischli had been to the Boom-Boom Room and had returned to the apartment. Defendant had asked Kashani to leave so he could have sex with Fleischli; and when she returned to the apartment to find defendant alone, he forced himself upon her. Defendant admitted the victim had been upset and had threatened to report the incident, so he stabbed her in the head, purportedly with a scuba knife. David Leitch later helped dispose of the body in a shallow grave and clean the apartment.

Del Frate also testified to several matters relevant to defendant's consciousness of guilt. (See, generally, 1 Witkin, Cal. Evidence (3d ed. 1986) §§ 657-658, pp. 642-645; 2 Wigmore, Evidence (Chadbourn ed. 1979) §§ 277-278, pp. 132-141.) He stated that defendant wanted him to find a witness who could incriminate David Leitch by claiming to have overheard a conversation between Leitch and Leitch's father in which Leitch admitted committing the crime and trying to make it look like defendant was guilty. Defendant also allegedly wanted Del Frate to fake an attempt on Tracy Leitch's life to dissuade her from continuing to help her husband in this case. When defendant learned David Leitch was free on bail, he also allegedly asked Del Frate to kill David Leitch, bury the body in the desert, and burn the car so that it would look like Leitch had fled.

In *People* v. *Alcala* (1984) 36 Cal.3d 604 [205 Cal.Rptr. 775, 685 P.2d 1126], we rejected the analogy defendant seeks to draw between the jailhouse informant situation and that of testimony by an accomplice. (*Id.* at

pp. 623-624.) Motives as between the two in testifying against a defendant are not the same.

Furthermore, problems with Fink's and Del Frate's credibility—their criminal past, possible payoffs by the Leitch family, their history as informers, the use of narcotics—were fully explored both on cross-examination and through presentation of inmate witnesses by the defense. Through instructions such as CALJIC Nos. 2.20, 2.21, 2.22, 2.23, 2.27, and 2.70, the jury was told that, as the sole judge of Fink's and Del Frate's credibility, it might consider anything having a tendency to prove or disprove their truthfulness, including: bias, interest, or other motive; prior inconsistent statements; character for honesty; or prior felony convictions. The jury was informed that a witness false in one material part of his testimony is to be distrusted in others and was told that evidence of any oral admission of the defendant ought to be viewed with caution. In addition to these instructions, defense counsel in closing argument fully discussed his contentions regarding the lack of credibility of these witnesses.

In light of this record we need not further consider whether a sua sponte cautionary instruction should have been given, nor need we discuss and distinguish the numerous federal and out-of-state cases cited by defendant. In *People* v. *Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776], we declined to impose a requirement of sua sponte cautionary instructions on informant testimony. We do so again here.

## VII.

*Cautionary Instruction Regarding Taking and Use of Notes*

The record at one point suggests that some jurors may have taken notes during trial. By settled statement, the parties have agreed that jurors were given notepads and pencils for this purpose, a number of jurors did take notes, and jurors were permitted to take their notes into the jury room during deliberations in the guilt and penalty phases of trial. The record does not reflect that a cautionary instruction was either requested or given sua sponte regarding the taking and use of notes by the jury.

Penal Code section 1137 implicitly approves of juror note-taking and contemplates that such notes will be used during deliberations. Numerous state and federal cases discuss the advantages and dangers of the practice. (See cases cited in *People* v. *DiLuca* (1982) 85 App.Div.2d 439 [448 N.Y.S.2d 730]; *United States* v. *Maclean* (3d Cir. 1978) 578 F.2d 64; Annot. (1967) 14 A.L.R.3d 831, and later cases (1987 pocket supp.).)

Relying on *DiLuca, supra,* 85 App.Div.2d 439, this court in *People v. Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161], stated that the better practice was to give an instruction cautioning jurors not to be distracted by their note-taking, not to permit notes to take precedence over their independent recollection, not to rely on the notes of another juror or on the fact that another juror has taken notes, and in case of discrepancy between their recollection and their notes, to request that the actual record of proceedings be read back to them. (*Id.* at pp. 746-747.) In *Whitt* the trial court had given instructions including many of these components and evidence of guilt was "relatively simple." (*Id.* at p. 748.) We thus noted that absence of cautionary instructions did not prejudice the defendant. ▮ In the present case, defendant states no instruction was given and evidence of guilt cannot be termed simple. Hence he alleges he was prejudiced by failure of the court to give a *Whitt* instruction sua sponte.

While *Whitt, supra,* 36 Cal.3d 724, held giving of such an instruction was the better practice, we have twice declined to hold that a sua sponte instruction is required and we have declined to determine whether, if it was required, the ruling in *Whitt* was retroactive. (*People v. Silbertson* (1985) 41 Cal.3d 296, 303-304 [221 Cal.Rptr. 152, 709 P.2d 1321]; *People v. Leach* (1985) 41 Cal.3d 92, 107 [221 Cal.Rptr. 826, 710 P.2d 893].) It does not appear that we must resolve these issues here.

It is true that no cautionary instruction was given. But it is also true that defendant has not demonstrated, either in the record or by means of a petition for writ of habeas corpus presenting evidence outside the record, how he might have been prejudiced by juror note-taking. We are not told, for example, that one juror took copious notes and dominated deliberations or that jurors appeared not to be paying attention to proceedings as they took notes on certain portions of testimony. While evidence of guilt might not be termed simple, one must also note that the jury at the guilt phase retired to deliberate at 4:45 p.m., on November 2, 1983, and at 11:20 a.m., on November 4, 1983, indicated it had reached a verdict. In the meantime it exercised its prerogative to request that substantial amounts of testimony, including that of Tracy Leitch, Kashani, and the defendant, be reread.

On this record it does not appear necessary to resolve issues left open in *Whitt, supra,* 36 Cal.3d 724, or to reconsider whether such cautionary instructions should be required only on request.

## VIII.

*Nonrepresentative or Guilt-prone Jury*

▮ A number of prospective jurors were challenged for cause after voir dire disclosed their opposition to the death penalty. Questioning was

conducted under the standards set forth in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] which appeared to require that a juror not be challenged for cause unless it appeared with unmistakable clarity that that juror would automatically vote against the death penalty under any circumstances.[24] Defendant contends that removal of such jurors violated his right to trial by a jury representing a fair cross-section of the community and further contends the process produced a guilt-prone jury thereby violating his right to due process.

We have previously rejected both of these arguments. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 78-79 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Fields* (1983) 35 Cal.3d 329, 342-343 [197 Cal.Rptr. 803, 673 P.2d 680] (cert. den. *sub nom. Fields* v. *California* (1984) 469 U.S. 892 [83 L.Ed.2d 204, 105 S.Ct. 267]); *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 68-69 [168 Cal.Rptr. 128, 616 P.2d 1301]; and see *People* v. *Balderas* (1985) 41 Cal.3d 144, 191 [222 Cal.Rptr. 184, 711 P.2d 480] and cases cited therein.) It is unnecessary in the present case to reconsider our views on the matter.[25]

## PENALTY PHASE

### FACTS

The prosecution presented no new evidence at the penalty phase. The defense produced the testimony of relatives and friends as to defendant's upbringing and good qualities and the testimony of two psychologists as to his personality disorders.

It appears that defendant's parents divorced when defendant was five and the new family moved to New York. Thereafter defendant and his sister were strongly discouraged from maintaining a relationship with their father. On two occasions when defendant seemed to side with his father, the mother sent him back to Chicago to his father, whether the father wanted

---

[24] *Witherspoon* has subsequently been modified in light of current practices in capital sentencing. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 418-426 [83 L.Ed.2d 841, 847-853, 105 S.Ct. 844].) It now suffices that the juror's views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.*, 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852], quoting *Adams* v. *Texas*, 448 U.S. 38, 45 [65 L.Ed.2d 581, 589, 100 S.Ct. 2521].)

[25] Defendant cites to *Grigsby* v. *Mabry* (8th Cir. 1985) 758 F.2d 226 urging that we reconsider that issue. *Grigsby*, however, is no longer the law, as the Supreme Court granted certiorari and reversed that decision in *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]. The court determined that "death qualified" jurors did not represent a distinctive group in the community. (*Id.* at pp. 174-177 [90 L.Ed.2d at pp. 148-150].) Further, it had not been shown that such jury was guilt-prone. (*Id.* at pp. 177-180 [90 L.Ed.2d at pp. 150-152].)

him or not. On the first of such incidents, defendant was only a child of seven.

Evidence indicated the stepfather was a strict disciplinarian who spanked the children with a strap for any infraction of his sometimes quixotic rules and molested defendant's sister from age 10 until she left the home at age 17. Defendant's mother invariably sided with the stepfather in any family dispute and indeed was repeatedly protective of him even in her testimony at this trial.

It was the opinion of one psychologist that this family situation left defendant confused, frustrated, very angry and with feelings of insecurity and inferiority. While defendant was not psychotic, he had a "mixed personality disorder" and an "atypical psychosis disorder" evidenced also by a detailed fantasy life in which he believed, inter alia, that he had been in the jungles of Viet Nam and had worked for the Central Intelligence Agency. The other psychologist described defendant's mother as cold, manipulative, demanding, and extremely self-centered. This psychologist opined that defendant never developed a conscience since the stepfather was an omnipresent conscience under which everything defendant did was wrong. This led to defendant's vivid imagination, limited insight, and poor impulse control and judgment and his difficulty separating fantasy from reality.

Defendant nonetheless had demonstrated some good qualities. His mother recounted how he worked three jobs to save the money for his first car. He was active in high school and formed his own band. He joined the army, received several letters of commendation, and ultimately an honorable discharge. Thereafter he received some higher education at California State University, Fullerton and Santa Ana College on the GI bill and became a photographer. Two former girlfriends testified to his kindness and other good qualities and stated he had never been abusive or violent. He had not previously been in trouble with the law. The defense introduced various pictures of defendant as a child and teenager and provided samples of his photographic work.

DISCUSSION

IX.

*Nonstatutory Aggravating Factors; Threats of Violence Under Section 190.3, Factor (b)*

In the first of his penalty phase arguments, defendant contends that the listing of aggravating factors in section 190.3 is exclusive and that no other

aggravating factors may be considered. He asserts that error therefore occurred when the prosecutor asked the jury to consider factors outside this listing, specifically defendant's lack of remorse and future dangerousness in prison. He asserts also that there were various instructional errors involved in consideration of threats of violence under factor (b) of section 190.3.

## A. *Exclusivity of Factors*

While under the 1977 death penalty law it was permissible to consider evidence not directly relating to a specific mitigating or aggravating factor (see *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 773 [175 Cal.Rptr. 738, 631 P.2d 446]; *Frierson, supra,* 25 Cal.3d at p. 177), we have recently determined that this is not the case under the 1978 law. In *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782] we held that while a defendant may present mitigating evidence beyond that suggested in section 190.3, the prosecution's case for aggravation is limited to evidence relevant to listed factors (other than factor (k)) or offered as rebuttal to defendant's mitigating evidence. (*Id.* at pp. 774-776; and cf. *Zant* v. *Stephens* (1983) 462 U.S. 862, 878-879, fn. 17 [77 L.Ed.2d 235, 251, 103 S.Ct. 2733] [states may limit aggravating factors to those enumerated in their statutes].)

## B. *Remorse*

Defendant contends that the prosecutor improperly asked the jury to consider defendant's lack of remorse. He argues lack of remorse is not a statutory aggravating factor: He also argues the prosecutor's remarks amounted to comment on failure to confess and hence violated defendant's Fifth Amendment rights. In his penalty phase argument to the jury, the prosecutor stated: "It would seem, in considering pity and mercy, that at least before we even considered that, we'd want to see, at least, some remorse from a defendant for his crimes. And what remorse have we heard about from Mr. Thompson? [¶] We had two psychologists testify, two relatives, two girlfriends. Not one thing has been said to indicate that that man has a sign of remorse for what he did. [¶] And after Ms. Fleischli's murder, what conduct did we see from this defendant? [¶] He sunned himself on the beach. He partied, he drank, he smoked dope. He went down to Mexico, went diving for lobster."

It appears that defense counsel failed to object to this argument or promptly request admonition. (*Green, supra,* 27 Cal.3d at p. 27; and see *Miranda, supra,* 44 Cal.3d at p. 108 [noting the applicability of *Green* to the penalty phase].) In any event, this argument does not appear to constitute improper presentation of a nonstatutory aggravating factor. Certainly when

the prosecutor opened his argument by listing the various factors, he did not remark that lack of remorse was an aggravating factor on which he would rely.

As we suggested in *People* v. *Coleman* (1969) 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248], the propriety of commenting on lack of remorse depends to a degree on the inference one is asking the jury to draw from it. (*Id.* at p. 1168.) It would be improper, for example, to suggest they draw a negative inference from defendant's exercise of his constitutional right not to testify. (*Ibid.*; and see *Griffin* v. *California, supra,* 380 U.S. 609 [comment on failure to testify]; *Estelle* v. *Smith* (1981) 451 U.S. 454, 462-463 [68 L.Ed.2d 359, 368-369, 101 S.Ct. 1866] [Fifth Amendment applies at guilt and penalty phases of trial].)[26]

Here, however, it appears that the prosecutor's arguments were directed at attacking defense evidence adduced to produce sympathy. Fairly read, he was attempting to negate evidence in mitigation, not directing the jury's attention at a specific aggravating factor. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 789-790.)

### C. *Prediction of Future Dangerousness*

■ The prosecutor argued that some crimes, because of their atrocity, justify the death penalty even though the offense seems isolated. He stated: "And so for one single, isolated, unprovoked, uncalled for atrocity, should this man be sentenced to the ultimate punishment? Or should he be spared because there's just one atrocity and not two, or not three? [¶] Shall we ask ourselves if even in prison can we be sure that he won't kill again?"

Defendant characterizes this as an invitation to the jury to speculate that if they imposed life without possibility of parole, defendant would kill prison guards or other prisoners and therefore this future dangerousness was an aggravating factor militating in favor of the death penalty. He relies also on our decision in *People* v. *Murtishaw, supra,* 29 Cal.3d 733 regarding penalty phase testimony forecasting violent acts in prison.

Again, defense counsel failed to object to this comment. (*Green, supra,* 27 Cal.3d at p. 27.) And in any event we cannot agree that this brief remark constituted an invitation to rely on a nonstatutory aggravating factor or that it constituted an argument of counsel unsupported by the evidence.

---

[26] While defendant testified at the guilt phase he did not testify at the penalty phase of his trial. Thereafter he again testified at the motion for new trial.

What the prosecutor was asking was that the jury contemplate defendant's potential for committing such acts, a potential the death penalty would obviously terminate. He was not making a prediction that future violence would in fact occur in prison and telling the jury to consider this as an aggravating factor. Immediately after his comment, he stressed that the issue before the jury, from which they should not stray, was whether the aggravating factors—"the nature of this crime"—outweighed any mitigating evidence. Prediction of future dangerousness was not a significant part of his argument.

Furthermore, defendant's reliance on *Murtishaw* is misplaced. That case involved testimony by an expert witness predicting that even in prison defendant would be violent and assaultive. (*Murtishaw, supra,* 29 Cal.3d at p. 767.) Given the level of unreliability for such predictions, the prejudice from such testimony, and the weight the jury might wrongly assign to it because of its expert source, we found its admission improper under the circumstances of that case. (*Id.* at pp. 767-775.)

*Murtishaw* did not, however, disallow any testimony, even any expert testimony, on the issue of future dangerousness. (*Id.* at p. 774; see also *Miranda, supra,* 44 Cal.3d at pp. 110-111.) Furthermore, there is no constitutional impediment to consideration of such testimony, whether expert or lay. (*Barefoot* v. *Estelle* (1983) 463 U.S. 880, 896-906 [77 L.Ed.2d 1090, 1106-1112, 103 S.Ct. 3383]; *Jurek* v. *Texas* (1976) 428 U.S. 262, 274-276 [49 L.Ed.2d 929, 939-941, 96 S.Ct. 2950]; see also *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 335 [86 L.Ed.2d 231, 243, 105 S.Ct. 2633].) Here we have no "established and credentialed expert" and we have no firm prediction. We have a single comment made in the course if the sort of vigorous argument a prosecutor is entitled to make. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].) We conclude that the prosecutor's comments were not beyond the proper bounds of argument and did not constitute invitation to consider a nonstatutory aggravating factor.[27]

---

[27] We also note that this jury, at the penalty phase, was given an instruction requested by the defense which stated: "In determining whether any fact necessary to support any fact in aggravation against the defendent has been proved beyond a reasonable doubt, you must not give any effect to suspicion, speculation or mere possibility that such fact is true. Every finding that you are called upon to make must rest on evidence of the type which reasonably inspires confidence and is of solid value. The law does not allow any fact to be found on the basis of suspicion, possibility, speculation or conjecture."

## X. and XI.

*Criminal Activity Involving Violence or Threats of Violence*

The jury was instructed, consistent with CALJIC No. 8.84.1, that: "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account, and be guided by the following factors, if applicable: [¶] [(a)] The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true. [¶] [(b)] The presence or absence of criminal activity by the defendant which involved use or attempted use of force or violence or the expressed or implied threat to use force or violence." (See also § 190.3, factors (a), (b).)

Additionally, in his argument the prosecutor read the various factors of section 190.3, commenting that many of them did not apply. After reciting factor (b), however, the prosecutor commented: "The only other evidence that we have presented in the guilt phase about other acts of violence would be the defendant's plans to kill anyone who got in his way or the testimony we've heard from Mr. Del Frate about the defendant's plan to kill the codefendant, Mr. Leitch."[28]

Defendant contends these instructions and argument virtually required the jury to consider (a) the contention defendant said he would kill someone if necessary to obtain a boat for his Southeast Asia trip, (b) his statement that he would kill refugees rather than transporting them to a new location, (c) his statement that if anyone got in the way of his plan he would kill them, and (d) his alleged discussion with Del Frate about killing Leitch and disposing of Leitch's car and body to make it appear he had fled.

He contends these alleged incidents were not properly considered under factor (b), noting that no specific instruction was given requiring the jury to find these incidents of criminal activity true beyond a reasonable doubt. He further notes the jury was not instructed it must find the corpus delicti of any such "crime" without resort to defendant's admissions or that admissions of the defendant should be viewed with caution. Finally he contends that in addition to any instruction on finding this criminal activity occurred beyond a reasonable doubt, the jury should have been instructed it must unanimously agree such activity had occurred.

---

[28] As noted in footnote 10, *ante,* Leitch was no longer a codefendant when the prosecutor made this remark.

██ We have recently confirmed that violent criminal activity or threats of violence offered as aggravating factors under factor (b) require proof of conduct constituting commission of an actual crime. (*Phillips, supra,* 41 Cal.3d at pp. 65-72.) Furthermore, we held in *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279], that the jury must be instructed that such crime must be established beyond a reasonable doubt. (*Id.* at pp. 53-55.) We suggested that the prosecution should request an instruction enumerating the specific crimes the jury may consider so that the reasonable-doubt instruction can be directly addressed to the designated crimes. (*Id.* at p. 55, fn. 19.) Finally, we have also noted that the trial court should not permit the penalty jury even to consider such a crime as an aggravating factor unless there is sufficient evidence to find its essential elements true under the reasonable doubt standard. (*Boyd, supra,* 38 Cal.3d at p. 778; but see *Miranda, supra,* 44 Cal.3d at p. 99 [unanimity not required].)

If there was factor (b) error, it did not arise from failing to instruct the jury on reasonable doubt as defendant contends. The trial court, over the prosecutor's objection, gave instructions requested by the defense which stated: "In this penalty phase on certain issues the state has the burden of proof beyond a reasonable doubt and all jurors must be so convinced. [¶] Before you may consider *any fact or sets of facts* as an aggravating circumstance, *all jurors* must find that the fact or the set of facts has been established by the evidence *beyond a reasonable doubt*. You may not consider any fact or set of facts as an aggravating circumstance unless you are satisfied *beyond a reasonable doubt* that the fact or set of facts is true. [¶] If you find any fact or set of facts to be true *beyond a reasonable doubt*, you are the sole judges of whether that fact or set of facts constitutes an aggravating circumstance as defined in these instructions. [¶] Further if you find any aggravating factors present, you are the sole judges of what weight, if any, that factor should be given." The court further instructed: "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, the presence of any aggravating factors [*sic*]. [¶] In determining *whether any fact necessary to support any fact in aggravation against the defendant has been proved beyond a reasonable doubt,* you must not give any effect to suspicion, speculation or mere possibility that such fact is true. Every finding that you are called upon to make must rest on evidence of the type which reasonably inspires confidence and is of solid value. The law does not allow any fact to be found

on the basis of suspicion, possibility, speculation or conjecture." (Italics added.)

While not specifically directed at the four incidents of threats of violence, these instructions met many of the *Robertson* concerns (*supra,* 33 Cal.3d 21). As for defendant's complaint that the trial court should also have instructed on the corpus delicti rule with respect to any criminal conduct and the need to view a defendant's admissions with caution, the jury did receive such instruction at the guilt phase. Given the tactical considerations that may attend giving such instructions again at the penalty phase, the trial court was under no sua sponte duty to so instruct. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 773; *Davenport, supra,* 41 Cal.3d at pp. 281-282; *Phillips, supra,* 41 Cal.3d at pp. 72-73, fn. 25.)

That is not to say that no possible error under factor (b) occurred in this case. It can be argued that the jury might have considered the asserted plans to kill refugees or kill to obtain a boat for the Southeast Asian venture as threats of violence not amounting to an actual crime. These plans were offered, however for impeachment purposes at the guilt phase, and a limiting instruction had been given. They were not specifically referred to by the prosecutor in his argument to the jury, even in his remark as to what evidence might come within factor (b). It is therefore speculative whether the jury would understand the general direction to consider all evidence received during any part of the case as a mandate both to consider these two incidents as specific aggravating factors and to ignore limiting instructions previously given. (See *Roberston, supra,* 33 Cal.3d at pp. 60-61, conc. opn. of Broussard, J.)

As to the threat to kill anyone who got in his way, we have noted previously this was offered not as other-crimes evidence at the guilt phase but as evidence of motive for the crime of which defendant was convicted. The Attorney General thus argues that while not coming within the terms of factor (b), it was admissible under factor (a) as evidence of the circumstances of the crime. (And see *Robertson, supra,* 33 Cal.3d 21.)

██ Even if we accept this as true, there remains the possibility that it was error for the prosecutor to refer to defendant's solicitation of Del Frate to kill Leitch as coming within factor (b). The solicitation was not a circumstance of the crime itself, and hence its admissibility under factor (a) is problematic. It was conduct supporting the commission of an actual crime—violation of section 653f, solicitation of murder—but it was apparently not supported by the testimony of two witnesses, resting as it did on the testimony of Del Frate, nor were there reliable corroborating circumstances. (See § 653f, subd. (e).) Since there was insufficient substantial evi-

dence to establish violation of section 653f as a separate crime, we conclude that whatever the relevance of this evidence at the guilt phase to show defendant's consciousness of guilt, the trial court should not have permitted it to be argued under factor (b) at the penalty phase. (See *Boyd, supra,* 38 Cal.3d at p. 778.)

The prosecutor, however, mentioned it only once and without emphasis. He promptly returned to his virtually exclusive theme, that the circumstances of this crime, the factor (a) consideration, was what justified imposition of the death penalty in this case and that defendant was not entitled to the jury's sympathy. His reference to threats of violence seems more in the nature of argument against defendant's evidence of his good character than affirmative presentation of other violent crimes evidence. (See *Rodriguez, supra,* 42 Cal.3d at pp. 791-792.)

■ We conclude that any error in permitting reference to solicitation of the killing of Leitch or threat to kill anyone who got in defendant's way was harmless under any standard in light of the brevity of the reference, the focus of both counsels' arguments, and the instructions given.

## XII.

*Refusal of Instructions Requested by the Defense*

### A. *Carrying Out the Jury's Sentence*

■ Defendant contends the trial court erred in failing to give several requested instructions. The first we shall discuss was defendant's proposed number 31 which provided: "You are instructed that if your decision in the penalty phase of this trial, is that the defendant should be put to death, the sentence will be carried out. On the other hand, if you determine that life without the possibility of parole is the proper sentence, you are instructed that the defendant will never be released from prison." During voir dire virtually all the jurors were informed, either by defense counsel or through general instructions from the court, that they should assume the sentence they voted for, whether death or life without possibility of parole, would be carried out. Defense counsel also commonly suggested that the jury would be so instructed at the conclusion of the penalty phase.

Despite what may have been conveyed to the jurors on voir dire, the trial court subsequently rejected the requested instruction on this subject since it was untrue and ignored a number of factors that might have meant this defendant either would not be put to death or would not serve the rest of his life in prison. Whatever its value in impressing on the jurors the seriousness

of their task at the outset of the the case—and that was the tone of questions to the jurors on this point—the instruction was, in the court's view, an inappropriate and misleading instruction for a jury entering into actual deliberations on penalty.

In a way, this proposed instruction presents a sort of "reverse Briggs" problem. The Briggs instruction informed the jury that the Governor had the power to commute or modify a sentence of life without possibility of parole to one of life with possibility of parole. (§ 190.3, 5th par.) Inferences from such instruction would include the possibility that a sentence of life without possibility of parole would not be carried out. The United States Supreme Court found no federal Constitutional error in an accurate instruction bringing to the jury's attention the possibility that the defendant might be returned to society. (*California* v. *Ramos, supra,* 463 U.S. 992, 1003-1013 [77 L.Ed.2d 1171, 1182-1183].)

This court nonetheless invalidated this instruction on state constitutional grounds, concluding that it invited the jury to be influenced by speculative and improper considerations. A jury might conclude that the penalty of death was the only penalty that could prevent defendant's return to society, not realizing that even a death penalty could be commuted. The jury would also be speculating on the fact that defendant in a certain number of years would be eligible for commutation and that a person as yet unidentified—a future Governor—might be inclined to grant his release. (*Anderson, supra,* 43 Cal.3d at pp. 1150, 1151; *People* v. *Myers* (1987) 43 Cal.3d 250, 270-273 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 153-158 [207 Cal.Rptr. 800, 689 P.2d 430].)

Applying these principles here, the first and principal problem with the proposed instruction is that it is not accurate. It ignores the power of the superior court to reduce a sentence of death on review under section 190.4, subdivision (e). It ignores the Governor's power of commutation. In commenting on its decision in *California* v. *Ramos,* the United States Supreme Court noted the prerequisite for upholding the Briggs instruction had been the determination that the instruction was both relevant to a legitimate state penological interest *and accurate.* (*Caldwell* v. *Mississippi, supra,* 472 U.S. 320, 335 [86 L.Ed.2d 231, 243, 105 S.Ct. 2633].) It is as incorrect to tell the jury the penalty of death or life without possibility of parole will inexorably be carried out as it is to suggest they need not take their responsibility as seriously because the ultimate determination of penalty rests elsewhere.

The proposed instruction also invites, although not explicitly, the same sort of speculation as to whether unidentified officials will in the future perform their job in a specified way and whether defendant will be unsuit-

able for any modification of his sentence. In general, impressing the jury with the weight of its responsibility is beneficial. Hence it was not necessarily error to suggest to them on voir dire that the sentence they decide on will be carried out.[29] At the stage of formal instruction to the jury at the penalty phase, however, the effect of the inaccuracy in this instruction is hard to predict.

We commented in *Ramos* that if a jury were to raise the issue of commutation, the trial court should briefly address the issue by accurately informing the jury of the commutation power but cautioning them against considering this factor in determining appropriate sentence. (*Ramos, supra,* 37 Cal.3d at p. 159, fn. 12.) Likewise should the defense request it, such a cautionary instruction should be given.

Similarly in this case, had the jury raised during deliberations the issue of whether sentence would in fact be carried out, the issue would have had to be addressed. Or had the requested instruction correctly informed the jury that whether or not there were circumstances that might preclude either the death penalty or life without possibility of parole from being carried out, they should assume it would be carried out for purposes of determining the appropriate sentence for this defendant, such instruction should have been given. This requested instruction, however, was properly refused. The fact that the subject had been mentioned during voir dire does not mean that refusing this requested instruction was error. (*Ghent, supra,* 43 Cal.3d at p. 770.)

B. *Deterrent Effect of Death Penalty, Costs of Life Without Possibility of Parole*

■ Defendant next discusses failure to give his proposed instruction No. 39 which read: "In deciding whether death or life imprisonment without the possibility of parole is the appropriate sentence you may not consider for any reason whatsoever the deterrent or nondeterrent effect of the death penalty or the monetary cost to the state of execution or maintaining a prisoner for life."

Actually, the prosecutor had not objected to the proposed instruction and the court seemed to agree that it should be given. The form on which it appears shows a checkmark indicating it was to be read to the jury. Nevertheless, the reporter's transcript indicates this was not done, and the pro-

---

[29] Defense counsel's remarks to the jury during closing argument as to what life without possibility of parole would really mean and what an unending punishment it would be were also within the scope of legitimate argument to the extent the remarks impressed on the jury the gravity of its task.

posed instruction is included in the clerk's transcript among instructions requested and refused. We assume that it was omitted by mere oversight.

We have held that neither evidence nor argument should be presented on the deterrent nature of punishment at the penalty phase. (*People v. Ghent, supra,* 43 Cal.3d at p. 770; *People v. Purvis, supra,* 60 Cal.2d at p. 341; *People v. Ketchel* (1963) 59 Cal.2d 503, 536 [30 Cal.Rptr. 538, 381 P.2d 394]; *People v. Love* (1961) 56 Cal.2d 720, 731 [16 Cal.Rptr. 777, 366 P.2d 33].) Questions of deterrence or cost in carrying out a capital sentence are for the Legislature, not for the jury considering a particular case. (*Spaziano v. Florida* (1984) 468 U.S. 447, 461-462 [82 L.Ed.2d 340, 353-354, 104 S.Ct. 3154].)

Although it would not have been error to give this requested instruction to forestall consideration of deterrence or cost, we conclude that its omission was not prejudicial. These considerations were not dwelt on at trial or focused on in argument. At most this instruction would have avoided speculation on the subject, a speculation made unlikely by the instructions and arguments of counsel which focused upon other factors such as sympathy on the one hand or the horrendous nature of the crime on the other.

C. *Failure to Give Requested Instruction on Potential for Rehabilitation*

 Defendant next complains that the trial court erred in refusing his requested instruction which would have told the jury to consider "The defendant's potential for rehabilitation and leading a useful and meaningful life while incarcerated." We conclude under the circumstances this was not error.

Certainly the jury in a capital case may not be precluded from considering as a mitigating factor any relevant evidence bearing on defendant's character, record, or offense. (*Eddings v. Oklahoma* (1982) 455 U.S. 104, 110-116 [71 L.Ed.2d 1, 8-12, 102 S.Ct. 869]; *Lockett v. Ohio* (1978) 438 U.S. 586, 604-608 [57 L.Ed.2d 973, 989-992, 98 S.Ct. 2954] (plur. opn.).) They are not limited to statutory mitigating factors. (*Hitchcock v. Dugger* (1987) 481 U.S. 393, 398-399 [95 L.Ed.2d 347, 353, 107 S.Ct. 1821, 1824].) Therefore evidence of adjustment to prison life and the possibility of rehabilitation would generally be admissible. (*Hitchcock, supra,* 481 U.S. at p. 399 [95 L.Ed.2d at p. 353, 107 S.Ct. at p. 1824]; *Skipper v. South Carolina* (1986) 476 U.S. 1, 4-5 [90 L.Ed.2d 1, 6-7, 106 S.Ct. 1669]; and see *People v. Morse, supra,* 60 Cal.2d 631, 647; *Conner v. State* (1983) 251 Ga. 113, fn. 9 [303 S.E.2d 266, 274]; *Simmons v. State* (Fla. 1982) 419 So.2d 316, 320.)

By relying on this line of authority, however, defendant does not address the narrow issue here. Defendant was not limited in the mitigating *evidence* he could introduce on rehabilitation or a meaningful life in prison. As noted above, he produced ample evidence of his troubled upbringing, his good qualities, his work and education. While it is not obvious that any of this evidence was directly presented as related to rehabilitation, defense counsel at least argued that these good qualities were still there and that he should not be put to death. What the court rejected was language the defense had buried in a much lengthier requested instruction modifying and adding to CALJIC No. 8.84.1 and objectionable in many respects.[30]

The proposed instruction was "refused as framed," and we are not cited to any requested instruction specifically directed to rehabilitation. Furthermore, the trial court was extremely generous in giving many specific instructions relating to defendant's prior emotional abuse, alcohol or drug consumption on the night of the crime, and other factors related to defend-

---

[30] The requested instruction read in full: "In determining which penalty is to be imposed on the [each] defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, [except as you may be hereafter instructed]. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was commmitted under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects [*sic*] of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Whether the defendant intended his acts to result in the death of the victim.

"(l) The defendant's history of being psychologically abused.

"(m) The defendant's lack of substantial criminal record or history.

"(n) The extent to which the defendant's developmental family history contributed, if at all, to the defendant's psychological state at the time of the offense.

"(o) The deterrent or nondeterrent effect of the imposition of the death penalty.

"*(p) The defendant's potential for rehabilitation and leading a useful and meaningful life while incarcerated.*

"(q) Any other circumstances which extenuates [*sic*] the gravity of the crime even though it is not a legal excuse for the crime." (Italics added.)

ant personally rather than to the crime.[31] There is no reason to believe that a properly drafted instruction would have been rejected. Again we find no error in refusing this instruction, particularly in light of the fact that no evidence was specifically presented and rejected as rehabilitation evidence, nor did the prosecutor argue that such evidence should not be considered.

### D. *Failure to Instruct on Lack of Intent to Kill as Mitigating Factor*

Finally, defendant objects that the trial court refused two sets of specific instructions, one telling the jury that if defendant did not specifically intend to kill the deceased, it might consider that to be a mitigating factor and the other telling the jury it must find intent to kill before imposing a sentence of death.[32] Despite the fact that, as discussed above, the jury returned a special finding at the guilt phase that defendant personally killed the victim and did so intentionally, defendant maintains these instructions should have been given to exploit any lingering doubt they may have had concerning defendant's intent.

Had the requested instructions actually asked the jury to consider any lingering doubts about defendant's intent to kill, despite the sufficiency of evidence to support their special finding, we might seriously consider whether refusal to give such instruction was error. In *People* v. *Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381], we noted a defendant may call upon such doubts in the penalty phase. (*Id.* at pp. 145-146; and see

---

[31] Indeed these instructions eliminate any claim the jury was misled by the trial court's giving an unmodified factor (k) instruction directing the jury to consider any circumstance which "extenuates the gravity of the crime." Not only were special instructions given regarding personal circumstances possibly attenuating defendant's guilt, but the jury was instructed: ". . . You should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances relating to the case or to the defendant, Thomas Thompson, as reasons for not imposing the death sentence." Similar points were repeatedly made during counsels' arguments, and even the prosecutor referred to factor (k) as a catch-all permitting the jury to talk about pity, sympathy, drug abuse or any other mitigating factor.

[32] These proposed instructions read: "At this hearing you have heard testimony which may indicate that the defendant did not specifically intend the death of the deceased.

"This evidence, if you find it to be true, may be considered by you as evidence of mitigation.

"If you find that the defendant did not specifically intend to kill the deceased, you may consider that as a mitigating factor and give it the weight you feel is appropriate.

"You may not vote for death unless you are convinced beyond a reasonable doubt that the defendant specifically intended to kill the deceased.

"If you find the defendant did not specifically intend to kill the victim, you may not impose the death penalty.

"If your verdict convicting the defendant of first degree murder was based exclusively on the felony murder rule, you may not vote the death penalty unless you find beyond a reasonable doubt that the defendant specifically intended to kill the deceased."

*Heiney* v. *Florida* (1984) 469 U.S. 920, 920-924 [83 L.Ed.2d 237, 238, 105 S.Ct. 303] [dissent by Marshall, J. to den. of pet. to vacate death sentence].)

But we have also noted there is a difference between calling upon residual feelings of doubt and inviting readjudication of matters resolved at the guilt phase. (*Terry, supra,* 61 Cal.2d at p. 147; see *People* v. *Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776].) That difference was not honored in the proposed instructions here which would have served to confuse the jury by inviting relitigation of the issue of intent. Finally, as to whether finding intent to kill is a prerequisite to imposition of a death sentence on a victim's actual killer, this position was rejected in *Tison* v. *Arizona, supra,* 481 U.S. 137, 156-157 [95 L.Ed.2d 127, 143-144, 107 S.Ct. 1676, 1688]. (See also *Anderson, supra,* 43 Cal.3d at pp. 1138-1147.) We conclude that proposed instructions on this point were properly rejected.

## XIII.

*Death as the Appropriate Penalty Beyond a Reasonable Doubt*

█ In his next issue defendant argues that the jury should have been instructed that it could impose a sentence of death only if it found beyond a reasonable doubt that aggravating circumstances outweighed mitigating and death was the appropriate penalty. We have previously rejected this argument and need not discuss it again here. (See *Miranda, supra,* 44 Cal.3d at p. 107; *Rodriguez, supra,* 42 Cal.3d at pp. 777-778.)

Defendant also complains of the "mandatory" aspect of the 1978 death penalty law. This jury was instructed pursuant to CALJIC No. 8.84.2 that: "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

█ As we explained in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] and elaborated upon in subsequent cases, such instructions have the potential of confusing the jury as to the nature of the weighing process it must perform and the scope of its power and responsibility for making the ultimate penalty decision. (See *People* v. *Myers, supra,* 43 Cal.3d 250, 273-276; *Allen, supra,* 42 Cal.3d at pp. 1277-1280; *Brown,*

*supra,* 40 Cal.3d at pp. 538-541.) In light of various special instructions given by this trial court and the arguments of counsel, however, there is no possibility that the jury was actually misled in this case.

This jury was instructed, for example, that it was the sole judge of whether facts constituted aggravating factors, and ". . . if you find any aggravating factors present you are the sole judges of what weight, if any, that factor should be given." As noted above, the jury was told it could consider "any other circumstances relating to the case or to the defendant" as reasons for not imposing the death sentence. They were told: "It is the combined weight of the factors not their number, which is determinative; you are not merely to count the number of factors on either side." Further, "Any mitigating circumstance, standing alone, may be sufficient to outweigh any number of aggravating circumstances, and any aggravating circumstance, standing alone, may be sufficient to outweigh the mitigating circumstances. The weight to which any or all specific mitigating or aggravating factors are entirely a matter for your determination."

The arguments of counsel similarly emphasized the qualitative rather than mechanical nature of the weighing process. The prosecutor, for example, told the jury, immediately after reading them the portion of CALJIC No. 8.84.2 noted above, that ". . . as far as this weighing procedure—and I caution you—I want to remind you, this is not a counting of factors. This is a weighing, a qualitative weighing of factors—you will be instructed that the weight of the factors, not their number, that is determinative. [¶] You are not merely to count the numbers on either side." While he asked the jury to consider whether the aggravating factors outweighed the mitigating factors, this was never described as a mechanical process.

Defense counsel certainly stressed the individual power of each juror, stating, "You are allowed in these proceedings when you go back there to take your personal beliefs, your philosophy of life, the Christianity if that's where you are, and to apply those principles that guide you that you think are right from your own personal view which may be different from somebody else's who may also be a Christian and to say I'm going to do this, this is my vote because of those principles." He even urged, without prosecutorial objection: "And if you don't think that you have the courage that you could go up there and could pull that switch that drops those pellets, and watch his eyes bulge out and turn purple, when he throws up on himself, then you don't have the right to vote to take his life." He concluded: "And you better [*sic*] everyone of you, have the courage that you told us that you had to take the responsibility, because each one of you, each of you has absolutely now the absolute divine right and control over the death of that man because he can't die without you." Under these circumstances, while

the objectionable portion of CALJIC No. 8.84.2 presented the potential for misleading the jury, there is no possibility the jury was actually misled in this case.

## XIV.

*Possible Double Counting of Factors (a) and (b)*

 As has been noted previously, this jury was instructed, pursuant to CALJIC No. 8.84.1 to consider as aggravating factors: "[(a)] The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true" and "[(b)] The presence or absence of criminal activity by the defendant which involved use or attempted use of force or violence or the expressed or implied threat to use force or violence." Defendant finds in this the theoretical possibility that the jury may erroneously have believed it could consider the crime of which they had just convicted defendant not only under factor (a) but again as violent criminal activity under factor (b), a double counting of aggravating circumstances.

Factor (b) as presented in section 190.3, paragraph six does not make it clear that double counting is not permitted. Paragraph one of the statute, however, does refer to the fact the jury may consider ". . . the presence or absence of *other criminal activity* by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence. . . ." (Italics added.) We have recently held that "double counting" the circumstances of the crime under factors (a) and (b) is improper. (See *Kimble, supra,* 44 Cal.3d at pp. 504-505; *Rodriguez, supra,* 42 Cal.3d at p. 787.)

While, as noted *ante,* there were some problems with consideration of factor (b) evidence, the record indicates that a double counting of aggravating factors was not one of them. When the prosecutor reviewed the various statutory aggravating factors at the outset of his argument and came to factor (b), he stated: "The only *other* evidence that we have presented in the guilt phase about *other* acts of violence would be the defendant's plans to kill anyone who got in his way or the testimony we've heard from Mr. Del Frate about the defendant's plan to kill the co-defendant, Mr. Leitch." (Italics added.) This construction of factor (b) to refer to other acts of violence was confirmed when the prosecutor later stated that really ". . . the single important aggravating factor present has to do, of course, with the nature of this crime."

The plan to kill David Leitch would, to the extent it was utilized at all, appear to have been presented as other criminal activity, not a double

counting of the offense of which defendant was convicted.[33] Defendant's threat to kill anyone who got in his way, however, had been introduced as relevant to his motive for the charged murder, and hence one may argue a double counting of factors occurred in again categorizing this under factor (b).

Nevertheless, we conclude that in light of the record as a whole, including the arguments of counsel, the jury would not have been lead into a mechanical counting of factors in which "double counting" would make some sort of difference. Nor would the court's failure to instruct the jury more precisely on what might be considered under factor (b) have led it to reach a conclusion on penalty it might not otherwise have reached. The focus of the prosecutor's argument was clearly on the crime and its circumstances, not on other criminal activity, and instruction on the jury's power to weigh factors pretty much as they wished lead us to conclude no reversible error occurred.

## XV.

### Rejection of Certain Evidence Offered by Defendant

Defendant next contends that the trial court erred in rejecting four items of evidence. First, he proposed to present evidence on exactly how the death penalty is carried out so that the jury could evaluate the physical and psychological suffering of the sentence they were about to impose. For much the same reason, he sought to introduce evidence as to how he would be housed to dispel any notion on the part of the jury that a sentence of life without possibility of parole was somehow a "lenient" sentence. Third, he sought to introduce evidence that it would not be more costly to maintain defendant on a sentence of life without possibility of parole than to put him to death. And finally he sought to introduce evidence that the death penalty does not deter crime.

As we have already discussed, a defendant must be permitted to introduce mitigating evidence on any aspect of his character or record and on any of the circumstances of his offense. (*Skipper* v. *South Carolina, supra,* 476 U.S. at pp. 4-5 [90 L.Ed.2d at pp. 6-7]; *Eddings* v. *Oklahoma, supra,* 455 U.S. 104, 110 [71 L.Ed.2d 1, 8].) Nor is he limited to mitigating factors particularly listed in the statute. (*Hitchcock* v. *Dugger, supra,* 481 U.S. 393, 398-399 [95 L.Ed.2d 347, 353, 107 S.Ct. 1821, 1824].) That does not mean he is unlimited in what he may introduce and it certainly does not

---

[33] For a discussion of other possible error in considering the plan to kill Leitch as a factor (b) aggravating factor, see *ante,* pages 128-129.

mandate the admission of evidence calculated only to shock the jurors and appeal to their passions and prejudices. (Cf. *Allen, supra,* 42 Cal.3d at pp. 1284-1285 [noting applicability of Evid. Code, § 352 to admission of mitigating evidence].)

Evidence of how the death penalty is carried out or what conditions in prison might be for a person serving a sentence of life without possibility of parole was not, as defense counsel candidly admitted, offered as "mitigating" evidence. It went neither to defendant and his background nor to the nature and circumstances of his crime. We have held that evidence as to how the death penalty is carried out should not be admitted. (*People* v. *Harris* (1981) 28 Cal.3d 935, 962 [171 Cal.Rptr. 679, 623 P.2d 240].) Describing future conditions of confinement for a person serving life without possibility of parole involves speculation as to what future officials in another branch of government will or will not do. (Cf. *Ramos, supra,* 37 Cal.3d at pp. 156-158.)

Defendant's reliance on certain language in section 190.3 does not lead to a contrary conclusion. Reducing section 190.3 to an unfair minimum, defendant quotes it to say he may present evidence "as to any matter relevant to . . . sentence . . . ." What it says, of course, is: ". . . In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to . . ." a listing of factors, all related to the circumstances of the crime or the defendant and his background. The reference to "sentence" then would appear to mean no more than that evidence must be relevant to the factors properly considered in imposing one of the sentences available to the jury at this point. It does not expand what those factors may be.

■ Defendant's evidence on how the death penalty would be carried out and how he might be confined in prison were more an attempt to appeal to the passions of the jurors than an offer of evidence relevant to this crime or this defendant's culpability for it. To the extent he had an interest in discussing this area to impress on the jury the gravity of their responsibility in the penalty phase of the trial, it was satisfied by his argument. (See discussion in fn. 29, *ante.*)

■ As for evidence of the deterrent value or lack thereof of the death penalty, statistics on that point seem inconclusive. (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 184-185 [49 L.Ed.2d 859, 880-881, 96 S.Ct. 2909].) It remains a proper matter for consideration by the legislative authority, not the jury imposing sentence in a particular case. (*Spaziano* v. *Florida, supra,* 468 U.S. at pp. 461-462 [82 L.Ed.2d at pp. 353-354].) Nor was it relevant here to

rebut argument by the prosecutor. The prosecutor continually focused on the nature of this crime and the argument that it justified the death penalty, without clearly choosing a theory such as retribution or deterrence.

Finally, as to evidence that costs of imprisonment for life would not necessarily be greater than the costs of carrying out a death sentence, we have already concluded that the jury could properly have been given defendant's requested instruction on this point. However, the fact that some prospective members of the jury during voir dire may have mentioned the question of cost does not mean that by the end of trial this factor entered in any way into their deliberation. (See *Ghent, supra,* 43 Cal.3d at p. 770.) Neither evidence produced nor the arguments of counsel made cost an issue in this case.

## XVI.

*Denial of Motion to Modify Verdict Under Section 190.4, Subdivision (e)*

■ Section 190.4, subdivision (e) provides that where the trier of fact has returned a verdict imposing the death penalty, the defendant is deemed to have made an application for modification of such verdict. It further provides: "In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." We have held that these provisions require an independent consideration of whether the evidence and aggravating and mitigating circumstances support imposition of the death penalty upon defendant, and we have required that reasons for denying the modification be given with sufficient particularity so as to permit effective appellate review. (See *Rodriguez, supra,* 42 Cal.3d at pp. 793-794; *Frierson, supra,* 25 Cal.3d at p. 179.)

In the present case defendant maintains that a portion of the trial judge's findings reflects the erroneous view that the absence of mitigating factors constitutes an aggravating factor. (See *Davenport, supra,* 41 Cal.3d at pp. 288-290.) He quotes at length from the court's findings.[34] He draws his

---

[34]Defendant quotes that portion of the trial court's comments in which it stated: "The court further finds, in evaluating the totality of the penalty phase evidence, in addition to the circumstances of the crimes of which the defendant was convicted, and the existence of any special circumstances found to be true, that there were proven numerous insignificant factors of mitigation, and that the aggravating factors were proved beyond a reasonable doubt, and

conclusion as to the trial court's misunderstanding of the law and inflation of aggravating factors from its factor by factor consideration of each of the circumstances in section 190.3.

Defendant's argument lacks merit for several reasons. First of all, while his quote from the trial court's findings is rather lengthy, it represents only a part of the trial judge's eight pages of findings. This trial court took particular pains to spread on the record its independent review and analysis of the facts of the guilt and penalty phases. It set forth its conclusion that aggravating factors primarily involving the crime itself outweighed any minor mitigating factors beyond a reasonable doubt, and its agreement with the jury's determination that death was the proper penalty, a finding described as "supported overwhelmingly by the weight of the evidence."

Second, in reviewing each of the factors of section 190.3, the trial court was apparently just trying to comply with the letter of section 190.4, subdivision (e) which it quoted at the outset of its findings and which requires that the trial judge be guided by these specified factors. We simply do not agree with defendant that from the language it chose, the trial court reflected a misunderstanding of the law regarding lack of mitigating factors constituting an aggravating factor.

Third, there is clear evidence that the trial court did not hold such misunderstanding. During consideration of jury instructions for the penalty phase of the case, defendant proposed a special instruction which would inform the jury: "If a factor is not found to be by you a mitigating factor,

---

that the defendant intentionally killed the victim. [¶] The court further finds that the aggravating factors overwhelmingly outweigh those minor mitigating factors. [¶] Number one, the court finds that the defendant did not commit murder while acting under extreme duress or, in fact, under any duress at all, or any mental or emotional disturbance or defect. [¶] Number two, the court finds that the defendant's age of 29 years at the time of the murder is not a mitigating factor and somewhat irrelevant. [¶] Number three, the court specifically finds that the victim did not participate in the defendant's homicidal conduct nor did she consent to the conduct. [¶] Number four, the court is satisfied that there were no circumstances which the defendant could reasonably believe to be a moral justification or extenuation for his conduct. [¶] The court further finds that there was an absence of proof of any prior felony convictions and considers that to be a mitigating factor. [¶] Number five, the court finds that there are no circumstances which extenuate the gravity of the crime even though it not be deemed a legal excuse. [¶] Number six, the court further finds that the defendant's capacity to appreciate the criminality of his conduct and his capacity to conform his conduct to the requirements of law were in no way impaired as a result of mental disease, defects, or the effect of any intoxicants, or drugs, or a combination thereof. [¶] The totality of the conduct of the defendant toward the victim of the crimes showed a high degree of cruelty, callousness, and viciousness. [¶] Accordingly, considering all the evidence, the court's personal assessment is that the factors in aggravation, beyond all reasonable doubt, overwhelmingly outweigh those in mitigation. And the automatic motion for modification of the jury's verdict of death as to this defendant, Thomas Martin Thompson, is denied."

that in and of itself does not make that factor an aggravating factor unless the prosecution proves to you that factor is an aggravating factor." That instruction was given in addition to a similar instruction apparently also requested by the defense and agreed to by the prosecution which stated: "The absence of a statutory mitigating factor does not necessarily constitute an aggravating factor." Neither counsel nor the court expressed any misunderstanding or disagreement with these instructions, and their ready acceptance negates the inference defendant wishes us to draw from the trial court's later comments pursuant to section 190.4, subdivision (e).

XVII.

*Proportionality Review*

While the meaning he assigns to the terms is not always clear, defendant asserts that the death penalty is "constitutionally disproportionate" in his case and requests that we engage in "comparative sentence review." In *People* v. *Frierson, supra,* 25 Cal.3d 142, 181-182 and *People* v. *Jackson* (1980) 28 Cal.3d 264, 317 [168 Cal.Rptr. 603, 618 P.2d 149], we refused to read a requirement of proportionality review or comparative sentence review into the 1977 death penalty law. The United States Supreme Court's decision in *Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871] indicates that the Eighth Amendment does not compel us to read such a requirement into the 1978 law. While such a review process may incline the high court toward upholding certain state death penalty statutes, it is not constitutionally required. (*Id.* at pp. 45-48 [79 L.Ed.2d at pp. 37-39].) Our death penalty law appears valid without it. (*Id.* at pp. 53-54 [79 L.Ed.2d at pp. 42-43]; see also Cal. Const., art. I, § 27; *Allen, supra,* 42 Cal.3d at pp. 1285-1288; *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.)

Defendant contends that we should nevertheless consider whether the death penalty is cruel or unusual punishment as applied to him. (See generally *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].) He offers, however, no persuasive analysis of the facts to support this claim.

Finally, we note that in the trial court defendant attempted to use a different theory in urging that he should not face the penalty of death. After all evidence had been presented at the penalty phase and before arguments of counsel or instruction to the jury, he requested that the trial court declare, pursuant to section 1385, that the maximum punishment in this case should be life without possibility of parole. In support of that request,

he offered to present his analysis of numerous other Orange County homicide cases decided under the 1978 law.

It is unnecessary to resolve in this case the propriety of using the power to strike under section 1385 to avoid the death penalty where all the evidence has been presented, but where the jury has not yet returned such a verdict. (Compare *People* v. *Zimmerman* (1984) 36 Cal.3d 154, 159 [202 Cal.Rptr. 826, 680 P.2d 776].) The fact that the judge did not subsequently choose to modify the sentence under section 190.4, subdivision (e), suggests no different result would have occurred if he had expressly considered the matter under section 1385.

## XVIII.

*Finding Particular, Listed Aggravating Factors True Beyond a Reasonable Doubt*

In his final issue defendant contends the death penalty statute is unconstitutional. His incorporation by reference of a portion of a brief in another case indicates his grounds for so arguing involve the by now familiar contention that a jury should be required to make written findings on aggravating factors and to unanimously find at least one such factor true beyond a reasonable doubt. He contends that the jury should be required to resort to an exclusive listing of aggravating factors rather than considering the list of factors in aggravation or mitigation presently contained in section 190.3. And he further complains that our 1978 law lacks the procedural safeguards of proportionality review (as discussed above).

We recently rejected these same contentions in *Allen* and *Rodriguez* and reject defendant's claims here on the same grounds. (See *Allen, supra,* 42 Cal.3d at p. 1285; *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.)

## CONCLUSION

Certain evidentiary aspects of this case require our special scrutiny. For example, evidence of the Southeast Asian venture carried with it the potential for undue prejudice even though the defendant reopened the subject through his own ill-advised testimony. Further, the need for the prosecution to rely to some degree on the testimony of witnesses such as Fink and Del Frate is disconcerting.

The defense, however, was allowed wide latitude in direct and cross-examination of the witnesses and great freedom of argument on these matters, and many special instructions requested by the defense were given on criti-

cal questions. The entire scenario, including the involvement of David Leitch, his violent background, prior relationship with the victim, flight to Mexico, and apparent help in disposing of the victim's body, was before the jury which very quickly returned both a verdict of guilt and a sentence of death as to the defendant. The jury is the proper body to weigh the evidence and inferences therefrom, determine the credibility of witnesses, and resolve questions of fact. (Cal. Const., art. I, § 16; § 1127; Evid. Code, §§ 235, 312; and cf. *Rodriguez, supra,* 42 Cal.3d at pp. 766-767.) In a capital case, it is the jury that determines, subject to review, whether the penalty shall be death or imprisonment for life without possibility of parole. (§§ 190.3, 190.4, subd. (e); *Myers, supra,* 43 Cal.3d at pp. 273-276; *Brown, supra,* 40 Cal.3d at p. 540.) Nothing indicates this jury was anything other than conscientious, analytical, and competent in discharging its responsibility.

The judgment is affirmed.

Lucas, C. J., Panelli, J., Eagleson. J., and Kaufman, J., concurred.

**MOSK, J.**—Concurring and Dissenting—I concur in affirming the judgment of guilt and the finding of special circumstances, but I dissent from the affirmance of the death penalty.

The majority appear to concede it was error for the court to admit evidence that while confined on the present charges defendant solicited Del Frate, a jailhouse informant, to kill Leitch, defendant's associate in crime. While the solicitation under more convincing circumstances—such as corroboration by other witnesses—could have been a violation of Penal Code section 653f, subdivision (b), it should not have been introduced in this case for any purpose. Nevertheless the majority find the error to be "harmless under any standard."

I do not share the confidence of the majority that this improper evidence had no effect on the jury weighing the issue of defendant's life or death. It appears to me reasonably possible that a jury, when considering penalty, would give serious consideration to evidence tending to prove that while defendant was awaiting trial for one murder he was at the same time attempting to arrange still another murder. This damaging evidence might reasonably convince the jurors that sparing defendant's life could well be dangerous to the lives of others, and thus tilt their decision toward the death penalty.

I do not minimize the seriousness of the crime of solicitation for murder—assuming that the uncorroborated word of a jailhouse informant is deemed credible, a dubious proposition at best. But the basic fact remains

that the alleged solicitation was an entirely separate offense that did not belong in evidence in this murder case.

The reasonable possibility of prejudice flowing from this error was enhanced when additional damaging evidence was admitted concerning a hare-brained scheme of defendant and Leitch to kill to obtain a boat, and then to kill Southeast Asian refugees whom they would purport to aid in seeking asylum. Little was done to consummate the alleged plan or to show that it was anything more than a drug-induced fantasy. Nevertheless this evidence, suggesting still more potential killing, would inevitably weigh in the minds of jurors considering whether or not the life of defendant was worthy of being spared.

I do not agree that the foregoing errors were merely efforts of the prosecutor to negate evidence in mitigation, as permitted by *People* v. *Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250] (lack of remorse). In his penalty phase argument the prosecutor inquired: "Ask yourselves this: do animals in the jungle, do they kill as coldly and brutally and mercilessly as this man did? . . . Shall we ask ourselves if even in prison we can be sure that he won't *kill again*." (Italics added.) Since there was no evidence of prior murders, the prosecutor's concern must have been aroused by the testimony of defendant's plans for future murders, i.e., to *kill again*.

Indeed, in the penalty phase the prosecutor specifically urged the jury to consider this evidence as criminal activity under factor (b) of Penal Code section 190.3. Thus, in discussing each of the factors listed in that section and in CALJIC No. 8.84.1, he quoted the language of factor (b) and then stated: "The only other evidence that we have presented in the guilt phase about other acts of violence would be the defendant's plans to kill anyone who got in his way or the testimony we've heard from Mr. Del Frate about the defendant's plan to kill the co-defendant, Mr. Leitch." The prosecution later conceded, in connection with the new trial motion, that this was error.

It is true the majority in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 791-792 [230 Cal.Rptr. 667, 726 P.2d 113], held that when mitigating evidence of good character is offered, the prosecution is entitled to *rebut* that evidence by showing "a more balanced picture of his personality." (*Ibid.*) I do not quarrel with that basic principle, subject to some limitations. However in this case the prosecutor did not offer the evidence of schemes for other killings in rebuttal; he presented it in the earlier phases of the trial. In fact, he put on no evidence in the penalty phase. Thus it would be fatuous to now claim that the tales of potential killings were merely rebuttal to good-character evidence offered by defendant in the penalty phase.

I have some problems with the guilt phase testimony claiming the deceased expressed fear of defendant. (See generally, *People* v. *Hamilton* (1961) 55 Cal.2d 881 [13 Cal.Rptr. 649, 362 P.2d 473].) An account of a voice from the grave is easily reconstructed with 20/20 hindsight and virtually impossible to disprove. In this instance, however, relating the purported concern of the victim was not prejudicial in light of cross-examination of the witness Tracy Leitch that substantially altered her original story.

Therefore I concur in affirmance of the judgment of guilt and in the finding of special circumstances, but I would reverse the penalty judgment. Since this offense was committed nearly seven years ago and a retrial will be difficult, the ends of justice may be served if the parties were to stipulate to a sentence of life without possibility of parole.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied June 23, 1988, and the opinion was modified to read as printed above. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.